[Civ. No. 14893. First Dist., Div. Two. Sept. 25, 1952.]

LEWIS BOIES, Respondent, v. C. ELLSWORTH WYLIE, Appellant.

Kenny & Morris for Appellant.

Schofield, Hanson & Sholars for Respondent.

GOODELL, J.—This action was brought on a promissory note for $10,000, by the assignee of the payee. Judgment was entered on the findings for $10,000 plus a counsel fee of $1,000 and costs. After the denial of a new trial this appeal was taken.

On April 17, 1946, appellant signed and delivered a document reading:

"$10,000.00            San Francisco, Calif.
                             April 17, 1946

"On April 17, 1947, for value received I . . . promise to pay to the order of Frank McArthur at San Francisco, California, the sum of Ten Thousand Dollars lawful money of the United States.

"In the event of suit to enforce the payment of this note, a reasonable additional sum shall be allowed as attorney's fees in such suit and made part of the judgment.

                     C. Ellsworth Wylie
                     State Building
                     San Francisco"

It was assigned for collection after maturity.

The answer alleges that the note was obtained by fraud in that the payee represented that he desired it for purposes personal to himself and "did not intend to receive or otherwise deal with said paper as a promissory note or as any obligation on the part of defendant, Wylie; that McArthur represented and stated that he would not seek to enforce the said paper writing by any manner or means, that he had no intention of ever attempting to collect anything on said paper," that such representations were believed and relied on by defendant, and that defendant received no consideration from the payee or otherwise. A cross-complaint containing substantially the same allegations prayed for its surrender and cancellation.

The court found that the note had been executed and delivered as alleged in the complaint; that it was unpaid; that there was a consideration therefor; that $1,000 was a reasonable fee, and that defendant's signature was not ob-

tained by fraud or by any representation that McArthur would not deal with the paper as a promissory note or as an obligation of defendant or that he did not consider the note a binding obligation.

The record shows that Frank McArthur was interested in the success of Robert W. Kenny in his candidacy for governor in 1946. The latter was then attorney-general and appellant was a civil service employee in his office in San Francisco. Early in April, 1946, McArthur while in San Francisco sought out appellant and gave him a check for $200 or $250 as an outright contribution to the Kenny campaign fund; it is not involved herein. A few days later McArthur delivered to appellant a check for $10,000 payable to "Kenny for Governor" at which time the note was delivered. That the $10,000 went immediately into the Kenny campaign fund and none of it was retained by appellant is beyond question.

The only witnesses in the case were McArthur and appellant. McArthur testified first and his direct examination was brief. On cross-examination, however, he was questioned at considerable length respecting the circumstances of the payment of the $10,000 and the signing of the note. The defense contends that appellant's testimony was not contradicted and that "Testimony which is not inherently improbable and is not impeached or contradicted by other evidence must be accepted as true." For this reason appellant's testimony will be summarized first.

Appellant testified that the day after McArthur gave him the check for $250 McArthur again contacted him and "expressed a very definite interest in the election of Judge Kenny for Governor, and that he would like to help in a more substantial way. He was thinking over the situation since he gave the $250 check . . . and he again asked how much the . . . Committee could use. I said, 'I have no idea how much they could use,' and he said he would like to see the candidate on the air in a very dominant way. He then suggested that he would be willing to give $10,000. He said, 'Do you think that would be sufficient?' I said, 'The committee would find that very agreeable,' but he said, 'On one condition only.' He said, 'I want you to sign a note for this amount of money.' I expressed very definite surprise at Mr. McArthur, that I should be asked to give a note. I said, 'For what reason should I give a note? As far as I know, this campaign is not borrowing the money.' He said, 'Well, don't worry about

it, I have my own personal reasons for wishing to have a note signed by you.' I said, 'Well, tell me the reason.' He said, 'Well, that is a confidential matter, but I have my personal reasons.' Then I said, 'Well, suppose that the . . . Committee, who are certainly men of substantial means, many of them, if they wanted to borrow money they could go to a bank. Why, in God's name, would I be signing a note borrowing money for the campaign, particularly when I am not good for it, and you certainly know that.' He said, 'Well, that doesn't make any difference.' I said, 'Well, there is no go on it. I am awfully sorry, but I certainly will not sign a note,' and that ended the conversation right there that day. . . . He came up the next day and stated he still was anxious to contribute . . . heavily.''

According to appellant, he said: '' 'But I want this note signed,' and he had the note in a blank book, so I said, 'You were talking yesterday about a personal reason. What is the personal reason that you have in mind about this note?' '' Appellant testified that McArthur said that certain members of his family had criticized him for spending too much money ''and if I have something to show them after giving this $10,000, I will have a reason, and it will prove that this is a bankable name, and they won't criticize me.'' ''I said, 'All right, on the basis that you want this simply as a subterfuge, . . . You know I am not good for it . . . It means nothing to me, this whole situation.' He said, 'Mr. Wylie, I assure you, if you sign this note, for that purpose, simply to give me a written acknowledgment of this money, it will help me . . . and you will never hear of the note again, and it will never be attempted to be collected,' and I signed the note and received the check in exchange.''

The foregoing testimony went in over respondent's objections. The court ruled that it might be struck out later but it never was struck out. ▇ We are satisfied that the defense was entitled to introduce this parol evidence. One of appellant's contentions is that ''While parol evidence to vary the terms of a written instrument is not admissible, evidence to show that there is not an agreement at all is admissible.'' In *P. A. Smith Co.* v. *Muller*, 201 Cal. 219, 222 [256 P. 411] the court said: ''It is well settled by the decisions in many jurisdictions that evidence that parties never intended a writing to constitute a contract, but that in lieu thereof another contract was entered into between them, is not objectionable under the parol evidence rule. Such evidence does

not change a written contract by parol, but serves to establish that such contract had no force, efficacy, or effect. (Citations.)'' And in *Cooper* v. *Cooper,* 3 Cal.App.2d 154 [39 P.2d 820], an action on a promissory note, the court held that parol evidence was admissible to prove that the document was not executed or delivered as an evidence of indebtedness but was given only as a memorandum and receipt of the sum of money appearing therein.

Respondent's counsel argue that even if this court ''were to take the most favorable view of appellant's authorities, it would be doing no more than the trial court has already done'' and add: ''The record indicates that at the trial the defendant presented much testimony to show that the note in question had been given for a different purpose than that normally accorded to notes. The plaintiff objected and presented his authorities thereon. . . . The court nevertheless *admitted* the evidence, subject to a motion to strike (which motion was not granted). The court heard appellant's testimony; the court as trier of fact judged the credibility of the witnesses; the court gave weight to appellant's evidence and then gave its decision. Respondent is at a loss to understand appellant's attempt to make admission of parol testimony an issue, for appellant cannot refute the record—*he has been heard,* and not believed.'' (The emphasis is respondent's.)

Appellant ''concedes that if Mr. McArthur had taken the witness stand after Mr. Wylie had given his testimony and then denied under oath the latter's testimony, the resulting conflict of evidence would have been unassailable on appeal.'' This contention narrows the question down to this: Does the testimony of McArthur admit appellant's statements of what happened, or does it present facts and circumstances which are irreconcilable with them and contrary to appellant's version of what happened—regardless of whether McArthur testified before or after appellant, and conceding that McArthur did not categorically challenge the truth of specific utterances of appellant? This brings us to McArthur's testimony.

McArthur testified that he asked appellant to have the endorsement put on the document and that ''There was quite a long conversation with Mr. Wylie in regard to the loan.''

To the question ''Was Mr. Kenny present at any of the conversations between you and Mr. Wylie, pertaining to this note?'' he answered ''Going through Mr. Wylie's office

. . . I stopped and talked to him about it two or more times.'' And when asked ''Did Mr. Kenny say to you anything about $10,000?'' he answered: ''He knew that Mr. Wylie was trying to negotiate a loan . . .''

A letter on ''Warren for Governor'' stationery, dated April 26 had been sent to McArthur, who forwarded it to appellant with the request that he send it on to Warren headquarters. There is a handwritten notation on the bottom thereof wherein McArthur wrote: ''When Wylie asked me to join the Kenny for Governor Club I donated $500 and because they claimed they were short of cash I loaned the Kenny for Gov. Club $10,000.'' McArthur was then directly asked: ''You did loan $10,000 to the Kenny for Governor Club? That is correct, isn't it?'' and directly answered ''That is correct.'' ''Q. You did not loan it to Wylie, you loaned it, as you say in that letter, to the Kenny for Governor Club? . . . A. . . . I loaned it to the Kenny for Governor Club, after Mr. Wylie had told me that, on account of this trip to Los Angeles, that it would be impossible to get them to sign, and he wanted to know if he was not temporarily good for that money. I told him . . . that I would take his signature. Mr. Kenny: Q. When you took his signature, did you inquire as to what Mr. Wylie's financial status was? A. No I did not . . . Q. Did you inquire whether or not he was a Civil Service employee of the State? A. No, I did not. Q. Did you inquire as to who were the gentlemen in the Kenny for Governor Club? A. I did not make any inquiry on that at all. I was told by Mr. Wylie that there was a number of people that were financially responsible for $10,000. Q. Did you ever ask Mr. Wylie to get their names on a promissory note? A. I was to have had their names, and I asked Mr. Wylie to furnish them to my attorneys . . . Q. You did not ask for any additional names until May 24th, isn't that correct? A. Whenever I told my attorneys to . . . Q. On April 17th, the day you gave the $10,000 check . . . did you make any effort to ascertain from Mr. Wylie who the gentlemen were on the Kenny for Governor Club? A. Only that they were responsible, and that their names would be, he said bankable to me.''

He then testified: ''Q. Now, before you went to Los Angeles you received a check for $100, isn't that correct? A. I did.'' He then identified the check dated May 17, 1946, drawn to Frank McArthur by R. W. Kenny on a Los Angeles bank.

He was then asked if he "made the loan without interest because you were anxious to see Kenny elected Governor?" and he answered in the affirmative.

He then testified: "Q . . . I believe you say you expected this note to be endorsed by other persons, isn't that right? A. Yes. Q. Just what did you and Mr. Wylie say in that respect? A. Well, at the time the note was given, he said it would be impossible to get those endorsements in the required time, and still have them on the same day that I went down to Los Angeles, or the same evening, if my memory holds up on that. Q. Is it not a fact that you thought at that time that the committee to elect Kenny for Governor would pay that note? A. Yes, I did . . . Q. You made that statement at that time to Mr. Wylie? A. Oh, yes, yes, and he wanted to know if his name was not temporarily good for it, and I told him it would be."

A letter dated May 24, 1946, from McArthur's attorneys was sent to appellant, saying that "Mr. McArthur feels that he should have a note payable the 31st day of December, 1946, which he informs me, was the date agreed upon, and that it should be signed or endorsed by members of the Kenny for Governor Committee, and by Mr. Kenny, in order that it may have some security behind it. . . ."

The following then occurred: "Mr. Kenny: Q. Now, you authorized the firm of Schofield & Hanson, by this letter, to obtain from Mr. Wylie a note from the Kenny for Governor interests, and that that note be payable on December 31, 1946. Do you recall that? A. Yes. Q. Now, why did you want the maturity date advanced from April 17th, 1947 to December 31, 1946? . . . A. In the conversation that I had with Mr. Wylie with regard to the note, I did not read it as clearly as I should have, and I thought that the date that I named was the date that Mr. Wylie and I verbally agreed on it, and I thought I was dealing with people that keep their word, or try to, and I wanted the security for what I thought was coming to me. Mr. Kenny: Q. You believed you were dealing with responsible parties that would make that good, is that right? A. Yes. Q. Who were these parties that you believed you were dealing with? A. I thought the Kenny for Governor Club—it was represented to me they were honest people that were financially good, and that they would sign the note, and I took Mr. Wylie's note as a temporary proposition."

Appellant testified that he saw McArthur about May 17 at the attorney general's office and that McArthur proposed "that he go to Los Angeles, that he could go down there and raise some money for the . . . campaign. He particularly cited a gentleman (naming him) whom he know . . . and that he was very well-to-do, and that on a friendly basis he was sure he could raise some money from (him) and that whatever (he) gave to the campaign he (McArthur) would match." Appellant testified that McArthur said "I think, however, that Judge Kenny should pay the expenses of the trip down." This surprised appellant, but the $100 check was given as already appears. Appellant testified that on this occasion Judge Kenny thanked McArthur "for the $10,000 donation."

Appellant on cross-examination testified that the $10,000 note was typed in his office and that the part of it providing for interest was deleted at McArthur's request, "He said," appellant testified, "he did not want to take any interest."

With respect to McArthur's handwritten notation on the "Warren for Governor" letter (wherein he wrote that he had made a *loan* of $10,000 to the Kenny committee) appellant testified that he read that statement and "Q . . . you were aware that, according to your understanding, he had made a gift of that money? A. Absolutely. Q. And when you got this two or three days later, which said he had made a loan, and you knew you had signed a promissory note, at that time did you make any protest to him? A. No, I thought he was a man of his word, and a man of honor, and that did not even occur to me as having any significance until later." Appellant testified that at no time did he produce a new note as requested by McArthur and that he never told McArthur that the maturity should be advanced to December 31, 1946.

To sum up: McArthur testified that he lent the $10,000 "to the Kenny for Governor Club, after Mr. Wylie had told me that, on account of this trip to Los Angeles, that it would be impossible to get them to sign, and he wanted to know if he was not temporarily good for that money. I told him . . . that I would take his signature . . . I was told by Mr. Wylie that there was a number of people that were financially responsible for $10,000" and "that their names would be, he said, bankable to me." That testimony cannot be reconciled with appellant's statement that McArthur said "if you sign this note . . . simply to give me a written

acknowledgment of this money . . . you will never hear of the note again, and it will never be attempted to be collected . . .''

Appellant's principal point on this appeal is that McArthur did not take the stand and categorically deny such statements as those last quoted which appellant attributed to him. But it is only fair to point out that appellant's side is subject to precisely the same criticism. Appellant could have been asked flatly whether he ever made the statements quoted above and attributed to *him* by McArthur (for example: ''he wanted to know if he was not temporarily good for that money''). But he was not asked any such questions, and so it turns out that appellant also failed to make categorical denials. The net result is that each witness gave his own version of the transaction—neither of which is reconcilable with the other—without either one of them coming right out with categorical denials of the other's words.

In *Lohman* v. *Lohman*, 29 Cal.2d 144, 149 [173 P.2d 657] the court said: ''Moreover, a trial judge is not required to accept as true the sworn testimony of a witness, even in the absence of evidence directly contradicting it . . .'' citing *Berg* v. *Journeymen's P. & G. F. Union*, 5 Cal.App.2d 582, 584 [42 P.2d 1091]. In the Berg case this court said: ''The general rule that uncontradicted testimony cannot be disregarded by the trial court is subject to many qualifications and exceptions. The rule has no application unless, the testimony is sufficiently positive in its character to be satisfactory from that standpoint, and even though the evidence is both positive and uncontradicted, it may be disregarded under certain circumstances. (Citations.) As was said in *Hufstetler* v. *Department of Industrial Relations*, 107 Cal.App. 741, at page 746 [290 P. 922], quoting from 10 California Jurisprudence, page 1145: 'As it is within the province of the trial court to determine what credit and weight shall be given to the testimony, *the appellate court cannot control a finding or conclusion denying credence, unless it appears that there are no matters or circumstances which at all impair the accuracy of the testimony.*' '' (Emphasis added.)

Under the rule just emphasized the appellant cannot successfully attack the trial court's findings herein since, as we have seen, McArthur's testimony laid before the court matters and circumstances which are not reconcilable with appellant's testimony.

One of the leading cases in this state on the direct contradiction of testimony is *Clark* v. *Tulare Lake Dredging Co.,* 14 Cal.App. 414 [112 P. 564]. What is said therein at pp. 431-432 is particularly apposite. A petition for hearing therein was denied, and the case has been repeatedly cited approvingly.

Appellant cites a group of 13 cases which were reversed because the court failed to give effect to uncontradicted testimony. Three were defaults, i.e., *Shepard* v. *Shepard,* 65 Cal.App. 310 [223 P. 1012], where the judge denied plaintiff a divorce because he suspected collusion; *Anso* v. *Anso,* 72 Cal.App. 513 [237 P. 814], where a divorce was denied despite a clear showing of extreme cruelty, and *Dobson* v. *Dobson,* 86 Cal.App.2d 13 [193 P.2d 794], where an annulment was denied where plaintiff and her corroborating witness testified that defendant was intoxicated at the marriage ceremony, but the judge felt that no ordained minister would have officiated in such a situation. In *Hynes* v. *White,* 47 Cal.App. 549 [190 P. 836] the only evidence introduced by the plaintiff was the deposition of the defendant. In *Gage* v. *Billing,* 12 Cal.App. 688 [108 P. 664], an action for legal services, testimony was given for the defense respecting a certain conversation, and the attorney (who was present thereat) was in court but did not deny the other side's version of it nor give any testimony of his own which would raise a conflict, as was done here. The remaining eight cases were simply instances where the evidence on one side presented a set of facts and circumstances and the adversary side neither contradicted them *nor presented any version of its own which was inconsistent and irreconcilable therewith.* In other words in none of the 13 cases were there two conflicting versions of the matter in dispute, each arrayed against the other, as there were in the case at bar.

The judgment is affirmed

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied October 25, 1952, and appellant's petition for a hearing by the Supreme Court was denied November 20, 1952. Carter, J., did not participate therein.