[Civ. No. 18769. First Dist., Div. One. Apr. 29, 1960.]

THELMA CATHERINE MEARS, Appellant, v. JOSEPH ASHER MEARS, Respondent.

486

490

491

William Scammon for Appellant.

Machado, Feeley & Machado for Respondent.

MOLINARI, J. pro tem.*—In this action for divorce wherein the wife filed an action against the husband and the husband filed a cross-complaint against the wife, the court rendered its interlocutory judgment of divorce granting to each of the parties a divorce on the ground of extreme cruelty and awarding to the respective parties certain items of community property. Findings of fact and conclusions of law were waived. This appeal by the wife is from certain portions of the judgment providing for the disposition of property found to be community property, from the judgment denying costs of suit and attorney fees, and from the order denying a new trial in said respects. The facts pertinent to this appeal are as follows.

The parties married in Portland, Oregon, on December 7, 1946, and separated on or about May 29, 1958. There were no children of the marriage. The husband testified that at

*Assigned by Chairman of Judicial Council.

the time of the marriage he had approximately $1,400 in cash, a tailoring business in Portland, and that he was the recipient of monthly service connected disability payments from the United States Government. The wife testified that at the time of the marriage her husband had $600 in cash and that she owned $800 in United States War Bonds. The husband's sister's testimony in this regard was that she handled her brother's funds prior to his marriage and while he was in the service; that these were deposited in a joint account in his and her name; and that when the account was closed in December 1955 these funds which amounted to $1,388.51 were transferred to an account in his name.

The husband testified that after the date of marriage he was a post office employee in addition to carrying on his tailoring business, and that his wife worked part time. He stated that the money which he had before marriage and his earnings from said business and employment were used for the purchase of cars, furniture, for living expenses, for vacations, and for the purchase of a home in Portland for the sum of $10,700, the down payment thereon being $5,100. The wife testified that the purchase price for the Portland property was $10,600; that the down payment was $4,500 of which $2,500 came from accumulated earnings and $2,000 was borrowed from her father; that she used the $800 in war bonds which she had prior to her marriage toward the purchase of the house; and that the loan from her father was repaid out of their respective earnings as was the remainder of the purchase price. Both parties testified that in 1951 they moved to California at which time they sold the Portland home and the tailoring business. Both stated that the home was sold for $13,900; and the wife testified that the tailoring business was sold for $1,500 of which $300 or $500 was deposited in a joint bank account, and the balance used for living expenses. It was also testified by the parties that a 1951 Studebaker auto was acquired with joint funds while they were in Oregon, the wife testifying "we paid for it together . . . we were both working," and that title was taken as joint tenants. There is no evidence as to its value.

It was the husband's testimony that he deposited $11,000 of the proceeds from the sale of the Portland home in a California bank in his own name; and that $7,000 from this bank account was applied toward the purchase of a home at Number 704 Distel Drive, Los Altos. The wife stated that said bank account was later placed in joint tenancy and that $6,800 was

withdrawn and applied as a deposit on account of the purchase price of said home, and that $2,800 was withdrawn by her and invested in an employment agency which later failed. Both parties testified that the title to said property was taken in joint tenancy. The wife testified further that when the loan on said property was renegotiated she contributed the sum of $510 which she had inherited from her father. She also stated that the subsequent payments on said loan came from "our both working." The husband, on the other hand, stated the payments on the home came from his monthly government disability checks which amounted to approximately $120 per month, and in this respect testified that he had been receiving these payments for about 11 years, and that he had commingled these payments aggregating $15,840 with all other funds "into the pot." The wife stated that these disability payments were approximately $100 per month; that they aggregated $13,200; and that said payments were commingled with other property; that the payments were first deposited in a joint account and then applied toward the payments on the home; that said joint bank account was used by both of them as they pleased. The wife testified in response to a question that the Los Altos house "was ours"; and in response to the question "Was it community property?" answered "Yes."

It was testified by the wife that a 1955 Buick in her possession was purchased for the sum of $3,413.42; that a 1950 Studebaker which she had inherited from her father was used as a "trade-in," an allowance therefor being made in the sum of $900; that the title to said auto was taken in their joint names; and that the remainder of the purchase price was paid from "community property."

Concerning certain articles of furniture and household furnishings it was testified to as follows by the wife: that the bedroom carpeting was purchased by her from her father's estate, as were a sectional davenport, ottoman, white leather chair, charcoal wing chairs, brass tray and candelabra which "I purchased from my separate estate"; that the oak round table, one rocking chair, and a hutch table were "from the estate of my father"; that one rocking chair was "separate property before I met Mr. Mears" as were a secretary, sterling silverware and Lenox china; and that the oak hall desk was purchased from proceeds realized from the sale of a Governor Winthrop secretary that "I had." By the husband: that

"some of the furniture" was purchased and acquired by him and his wife in Oregon and California prior to her inheritance from her father; that what was acquired after the inheritance was from "community funds," excepting the sterling silverware, Lenox china, and the secretary which he acknowledged were owned by the wife prior to the marriage; and that the ottoman and leather chair were a gift to him from the wife. The wife testified further that she sold a piece of property in Seaside, Oregon, for $1,000 out of which she loaned her husband $700, of which he later repaid the sum of $500 which she applied to the purchase of furniture.

Both parties testified that they purchased 15 shares of Varian Associates stock the title of which was taken in joint tenancy by agreement. The wife stated that said stock was purchased for $277.70 of which $189.17 came from the sale of furniture which she inherited from her father, and $88.53 from "our joint community checking account."

According to the testimony of both parties a paint business known as Mears Paint and Wallpaper Company was purchased for the sum of $4,000 which was borrowed from the wife's father; that a promissory note therefor was executed by them; and that $200 was paid on account. The wife admitted that said note was not included in her father's estate, stating that she "tore it up a month or so" after his death, and explaining an entry in the books of the paint company by an accountant reading, "Loan payable, Charles E. Davis, $3,800.00 Capital, $3,800.00. To record translation of debt per will," as follows: "He knew that my father had died and that we wouldn't be paying it back because the money was mine," so he put it to capital . . . for income tax purposes. The husband testified *that about two months prior to his death his father-in-law told* him to "forget about the note, that is a gift to you." The husband stated that the paint business is now worth $3,000, while the wife testified that her husband told her he was offered $7,500 for it. She stated further that the said business "belongs to me and my husband."

The wife testified that she operated a business known as the Excel Temporary Personnel Agency in copartnership with another person; that she and her copartner each invested $1,500 in said business; and the $1,500 so invested by her came from moneys inherited from her father's estate.

There was testimony that two poodles were acquired by the parties, the wife testifying that they cost $250 which she borrowed from her sister-in-law and repaid out of her salary,

and the husband testifying that one of them cost $125, the purchase price being advanced by his sister.

A certain piece of real property, Lot B, Tract 219, Peninsula Garden Farms, Palo Alto, was purchased according to the wife's testimony, for the sum of $16,500 which she "inherited from her father's estate." The husband admitted that he had executed a grant deed to his wife conveying this lot to her as her sole and separate property. He testified further that this property "was bought with her inheritance for $16,500" and that "I never wanted anything to do with her properties."

There was testimony also to the effect that the wife withdrew $300 from a bank book which was solely in her name for the purpose of taking a trip to Mexico with her husband, and that on another occasion she withdrew $150 from the same account so that she and her husband could go to the Rose Bowl game.

It was also testified by the wife that she and her husband borrowed $2,000 from Mr. and Mrs. Willard Coons for the purpose of paying income tax and bills owed by the paint business. Mrs. Coons testified that $200 was paid on account of the note leaving a balance of $1,800. In addition to the foregoing, the following testimony of the husband appears in the transcript, commencing on line four, page 225: "A. We had all of our early account at the Palo Alto Mutual Savings & Loan. Q. And in whose name were they deposited? A. I made the original deposit. She might have made some of the subsequent deposits. Q. Whose name was the book in? A. I think solely in my name. Q. At first? A. Yes, because I was the only party in California. Q. Was that later changed? A. Not—I don't know whether it was or not. Q. Your wife has testified that it was changed, that it was in a joint tenancy account. Do you recall that? If you don't say you don't. A. Well, I do know this, that anything we bought we figured that it was of any importance, and we had discussed this before we had done any of these things, that we would put it in joint tenancy for the simple reason that we felt that that would eliminate any court trouble if either of us should pass away. It would go to the other automatically. Q. And that is the way you and your wife had the understanding? A. That is right. Q. Of all your properties? A. Anything we bought, whether it be a car or a home or a business or anything. Q. And did you follow that understanding? A. That is right. MR. SCAMMON: Your honor, I ask that that entire testimony go

out. . . . He has testified that this was his understanding. THE COURT: Yes, that will have to be brought out by conversation, not understanding. Understanding is a conclusion. MR. MACHADO: All right, I will ask him that. Q. (By Mr. Machado) Did you discuss that with your wife? A. I certainly did. Q. And what was said by her? A. She said that she was in accord with it because of the fact that she wanted to eliminate any possibility of any court action or anything to get things settled if either of us should die or an accident should cause either death. Q. Was that said by her? A. That is right. Q. And it was said by you? A. It was said by me and her both.''

The pertinent portions of the interlocutory decree provide as follows: (The quoted language is taken verbatim.)

(2) That the plaintiff wife be awarded ''the following community property as her sole and separate property'': (a) the 1955 Buick; (b) the real property described as Lot B, Tract 219, Peninsula Garden Farms, San Antonio Road, Palo Alto, California, ''heretofore deeded to her by Joseph Mears as her sole and separate property''; (c) the two poodle dogs; (d) the sterling silverware, and the Lenox china ''which belonged to Mrs. Mears before marriage''; (e) a floral pattern dish set, a violin, two family portraits and two fruit prints, ''all items being part of the estate of the father of Mrs. Mears.''

(3) That the defendant husband be awarded ''the following community property as his sole and separate property:'' (a) the 1951 Studebaker automobile; (b) the Mears Paint and Wallpaper business.

(4) ''The remainder of the property of the parties hereto, which the court finds to be community, shall be sold and the proceeds thereof distributed as follows: (a) the sum of $3,800.00, money borrowed from the father of plaintiff and cross-defendant, to plaintiff; (b) the sum of $200.00, balance due for money loaned to Mr. Mears by Mrs. Mears, to plaintiff; (c) the sum of $1,800, balance due Mrs. Coons for money loaned, to be repaid to Mrs. Coons.''

(5) ''The assets of the Excel Temporary Personnel Agency, subject to its liabilities, are declared to be community property. (a) The real property at 704 Distel Drive, Los Altos, California, the furniture, household furnishings, fixtures and effects therein, and the fifteen (15) shares of Varian Associates stock are declared to be community property.''

(6) ''The remainder of the property not heretofore men-

tioned, which the court finds to be community property, shall be sold. The net proceeds of community property ordered sold shall be divided equally between the parties.''

The appellant attacks portions of the decree on the grounds hereinafter specified, and makes the following contentions, to wit: (1) that the court erred in finding that the Excel Agency, Lot B, Tract 219 real property, and certain household furnishings, namely, the bedroom carpeting, oak hall desk, two rocking chairs, round oak table, and hutch table, were community property; that under the evidence and the law the same should have been declared to be separate property; (2) that the court should have found that the remainder of the household furnishings to the extent of $500; the Varian stock to the extent of the proportion of her separate funds ($189.17) contributed to the purchase price; the Buick automobile to the extent of the $900 trade-in allowance; and the Distel Drive home to the extent of the $510 advanced by the wife from her separate funds for the loan renegotiation constituted the separate property of the wife; (3) that the sums of $150 and $300 advanced to the husband and the community from the wife's separate estate should have been reimbursed to her; (4) that the wife should have been awarded one-half of the paint business as her share of said community property.

At the outset we are confronted with two fundamental principles which are applicable to this case: ██ First, that each spouse having been awarded a divorce on the ground of cruelty, the court was required to order an equal division of the community property (*De Burgh* v. *De Burgh,* 39 Cal.2d 858, 874 [250 P.2d 598]; *Gilb* v. *Gilb,* 170 Cal.App.2d 379 [339 P.2d 176]; *Diamond* v. *Diamond,* 149 Cal.App.2d 788 [308 P.2d 909]; *Williams* v. *Williams,* 146 Cal.App.2d 307 [303 P.2d 586]); and second, that where findings of fact and conclusions of law are waived, every intendment is in favor of the judgment, that the assumption will be made that the trial court found every fact essential to support the judgment, and that findings will be implied in favor of the successful litigant upon all of the issues raised by the pleadings. (*Bekins Van Lines, Inc.* v. *Johnson,* 21 Cal.2d 135 [130 P.2d 421]; *Gray* v. *Gray,* 185 Cal. 598 [197 P. 945]; *Roberts* v. *Adams,* 164 Cal. App.2d 312 [330 P.2d 900]; *Childers* v. *Childers,* 74 Cal.App. 2d 56 [168 P.2d 218].) ██ The latter rule is subject to the qualification, however, that *where the transcript is before the reviewing court* (as it is here), the court is not required to indulge in an assumption as to the sufficiency of the evidence

to support the implied findings. The sufficiency of the evidence will be determined from an examination of the evidence itself. (*Childers* v. *Childers, supra,* 74 Cal.App.2d 56.)

Where the transcript of the evidence is before the reviewing court it will not weigh the evidence to determine what is true and what is not true, but it will search the record for the purpose only of determining whether there is substantial evidence supporting the judgment and will resolve all doubts in favor of the judgment. (*Baker* v. *Baker,* 98 Cal. App.2d 424 [220 P.2d 576] ; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].)

The question presented by this appeal, then, is whether the evidence is sufficient to sustain the trial court's implied findings that certain property was community property, and having so determined to ascertain whether or not the community property was equally divided.

In reviewing the evidence before us we must be guided by certain applicable rules. They are these: That all property of a husband or wife owned by him or her before marriage, and that acquired afterward by such spouse by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is the separate property of that spouse (Civ. Code, §§ 162, 163).

"This property does not change its character as a result of the marriage nor by its mere use in the marital relationship." (*Kenney* v. *Kenney,* 128 Cal.App.2d 128, 135 [274 P.2d 951].) *All other property* acquired by the husband or wife after marriage is community property and the burden is on the party seeking to establish that such property is in fact separate. (Civ. Code, § 164; *Falk* v. *Falk,* 48 Cal.App.2d 762, 768 [120 P.2d 714] ; *Kenney* v. *Kenney, supra,* 128 Cal. App.2d 128, 135.) "There is a presumption that the post marital property is community (Civ. Code, § 164), but this is a presumption that may be overcome by a preponderance of *contra* evidence." (*Kenney* v. *Kenney, supra,* 128 Cal.App.2d 128, 135; *Gudelj* v. *Gudelj,* 41 Cal.2d 202 [259 P.2d 656] ; *Estate of Bryant,* 3 Cal.2d 58 [43 P.2d 529].) The presumption does not apply pursuant to the provisions of Civil Code, section 164, where the property is acquired by a married woman by an instrument in writing, or if acquired by a married woman and another person by an instrument in writing, or when acquired by a husband and wife by an instrument where they are not described as husband and wife. There appears to be a question as to whether the presumption that property is community property is available where property

is acquired after marriage by either husband or wife by gift, bequest, devise, or descent as provided by sections 162 and 163 of the Civil Code. There are authorities which apparently hold that the presumption applies and that to overcome the presumption that the property is community property it must be shown by satisfactory proof that the property was acquired by a spouse by gift, bequest, devise, or descent (*Falk* v. *Falk, supra,* 48 Cal.App.2d 762; *Wilson* v. *Wilson,* 76 Cal. App.2d 119 [172 P.2d 568] ; *Estate of Jolly,* 196 Cal. 547 [238 P. 353] ; *Pedder* v. *Commissioner of Internal Revenue,* 60 F.2d 866). In *Hiatt* v. *Seyster,* 122 Cal.App. 612 [10 P.2d 473], the court said, on pages 615 and 616 : ''Sections 162 and 164 must be read together; and it will be noted from the wording of the opening clause of section 164 upon which appellant relies that the presumption of community property arising therefrom relates to 'all *other* property acquired after marriage,' that is, to all property other than that acquired in the manner set forth in section 162 (and § 163 which applies to the husband's separate property).'' While not specifically cited therein, the Supreme Court in *Rozan* v. *Rozan,* 49 Cal.2d 322 [317 P.2d 11], apparently approves the distinction made by the Hiatt case. The court said, on pages 327 and 328 : ''Moreover there is a presumption *that in the absence of evidence of gift, bequest, devise or descent,* all property acquired by the husband after marriage is community property.'' The character of the property as separate or community is fixed as of the time it is acquired; and the character so fixed continues until it is changed in some manner recognized by law, as by agreement of the parties. (*Ciambetti* v. *Department of Alcoholic Beverage Control,* 161 Cal.App.2d 340, 345 [326 P.2d 535].) ■ A husband and wife may by express or implied agreement change the status of their property from separate to community and vice versa; and persuasive evidence of such an understanding will rebut any presumption arising from the form in which the property has been held. (*Estate of Furtsch,* 43 Cal.App. 2d 1 [110 P.2d 104] ; *Tischhauser* v. *Tischhauser,* 142 Cal.App. 2d 252 [298 P.2d 551] ; *Tomaier* v. *Tomaier,* 23 Cal.2d 754 [146 P.2d 905] ; *Kenney* v. *Kenney, supra,* 128 Cal.App.2d 128.) ■ Even in the absence of agreement, separate property may become community property by the process of commingling in such a manner to make segregation impossible, thus requiring the application of the presumption that it is community property. (*Grolemund* v. *Cafferata,* 17 Cal.2d 679, 683 [111 P.2d 641] ; *Kenney* v. *Kenney, supra,* 128 Cal.

App.2d 128.) However, if the property, or the source of funds with which it is acquired may be traced, a mere change·in form or identity during the marriage will not alter its separate status. If the source of funds allocable to separate property and to community property can be ascertained the property is not so commingled that all of the property becomes community property. (*Tassi* v. *Tassi,* 160 Cal. App.2d 680 [325 P.2d 872] ; *Huber* v. *Huber,* 27 Cal.2d 784 [167 P.2d 708] ; *Thomasset* v. *Thomasset,* 122 Cal.App.2d 116 [264 P.2d 626].) When property is conveyed to a husband and wife as joint tenants, the form of the conveyance is such as to destroy the statutory presumption that the property is community ; such an instrument creates a tenancy in which the interests of the husband and wife are separate property. (*Siberell* v. *Siberell,* 214 Cal. 767 [7 P.2d 1003].) It is the settled law of this state, however, that the form of the instrument under which a husband and wife hold title is not conclusive as to the status of the property and that property acquired as joint tenants may be shown to be actually community property or the separate property of one spouse according to the intention, understanding or agreement of the parties. (*Gudelj* v. *Gudelj, supra,* 41 Cal.2d 202 ; *Socol* v. *King,* 36 Cal.2d 342, 345 [223 P.2d 627] ; *Tomaier* v. *Tomaier, supra,* 23 Cal.2d 754 ; *Tompkins* v. *Tompkins,* 83 Cal.App.2d 71 [187 P.2d 840] ; *Rogers* v. *Rogers,* 86 Cal.App.2d 817 [195 P.2d 890].) It is likewise well settled that in a divorce action, the court is without power to assign one spouse's separate property to the other. (*Fox* v. *Fox,* 18 Cal.2d 645 [117 P.2d 325] ; *Barba* v. *Barba,* 103 Cal.App.2d 395 [229 P.2d 465].) However, where the issue presented is the nature or character of the property, the court has jurisdiction to determine whether it is separate or community property, and it may even determine that property is held in joint tenancy. (*De Soto* v. *De Soto,* 113 Cal.App.2d 250 [283 P.2d 1052] ; *Haines* v. *Wertman,* 108 Cal.App.2d 841 [239 P.2d 889].)

This brings us to the question as to the nature of the property awarded in the decree. The court found that the property was community property. If there is substantial evidence to support such finding, and if such property was divided equally between the parties we must affirm the court's action. The finding of a trial court that property is either separate or community in character is binding and conclusive on the appellate court if it is supported by sufficient

evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences; and if a trial court determines that a presumption has been overcome such determination will not be disturbed on appeal if there is substantial conflict, if different inferences might fairly be drawn from the evidence. (*In re Rauer's Collection Co.*, 87 Cal. App.2d 248 [196 P.2d 803]; *Rogers* v. *Rogers, supra*, 86 Cal. App.2d 817.)

In view of the respective contentions of the parties as to the sufficiency of testimonial evidence, the several references to the effect of uncontradicted testimony and the power of the trial court to reject such testimony, we reiterate the general rule that "uncontradicted and unimpeached testimony of a witness which is not inherently improbable, cannot be arbitrarily disregarded and should be accepted as true by the trier of fact *where it is not found that the testimony was false,* in which case the appellate courts must presume it was true." (Emphasis added.) (*La Jolla Casa de Manana* v. *Hopkins,* 98 Cal.App.2d 339, 345 [219 P.2d 871]; *Dobson* v. *Dobson,* 86 Cal.App.2d 13 [193 P.2d 794]; *Gomez* v. *Cecena,* 15 Cal.2d 363 [101 P.2d 477]; *Estate of Kuttler,* 160 Cal. App.2d 332 [325 P.2d 624].) "In other words the testimony of a witness normally cannot be disregarded; unless impeached or contradicted by other testimony, by some presumption or by an inference deducible from the facts proved, or unless it is inherently improbable, the court must accept it as true." (Witkin, Evidence, p. 535.) The general rule has exceptions. In the La Jolla case the court said at pages 345 and 346: "An appellate court cannot control a finding or conclusion denying credence, unless it appears that there are no matters or circumstances which at all impair the accuracy of the testimony, and a trial judge has an inherent right to disregard the testimony of any witness, or the effect of any prima facie showing based thereon when he is satisfied that the witness is not telling the truth, or his testimony is inherently improbable due to its inaccuracy, due to uncertainty, lapse of time, or interest or bias of the witness. All of these things may be properly considered in determining the weight to be given the testimony of a witness although there be no adverse testimony adduced. The trial judge is the arbiter of the credibility of the witnesses. A witness may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his

account of particular transactions or of his own conduct as to discredit his whole story. His manner of testifying may give rise to doubts of his sincerity and create the impression that he is giving a wrong coloring to material facts. Where conflicting inferences may be drawn from testimony, the court is bound by the findings of the trial court as conclusively as in other cases of conflict.'' ▇▇▇ If the testimony is properly disbelieved, its rejection does not create affirmative evidence to the contrary of that which was discarded. (*Estate of Bould*, 135 Cal.App.2d 260 [287 P.2d 8, 289 P.2d 15]; *Estate of Kuttler, supra*, 160 Cal.App.2d 332.) It is apparent that where the exception concerning credence comes into play there must be a positive finding or conclusion concerning credence. Such a finding cannot be implied merely because findings have been waived in view of the presumption that a witness is presumed to speak the truth. (Code Civ. Proc., § 1847.) ▇▇▇ We do not believe that the rule calling for the assumption of every fact essential to support the judgment where findings are waived compels us to imply the finding that a court did not believe uncontradicted testimony to a particular fact so as to create affirmative evidence to the contrary of that which the court rejected.

We must first consider the above quoted portion of the testimony from the transcript. The respondent husband contends that this testimony was sufficient to support the court's implied finding as to the community character of the property. He relies upon the husband's response that it was his and his wife's ''understanding that anything we bought whether it be a car, a home or a business or anything'' would be ''put in joint tenancy.'' It appears from the court's remarks that this answer was stricken by the court on motion. But whether it was stricken or not, the substance of this testimony, as well as the remainder of that quoted, is that it was the understanding that they would take title in joint tenancy for the purpose of facilitating transfer upon the death of either of them and to thereby preserve the right of survivorship. There is nothing in this testimony of itself upon which an inference could be drawn that the parties intended or agreed to change separate property into community or vice versa. We must look elsewhere in the record to find such evidence, if any there is; and in so doing we must consider the evidence in respect to each of the respective items of property. ▇▇▇ In this connection we must bear in mind the rule that where the pleadings establish that property

held in joint tenancy is community property, its treatment as such by the trial court is proper. (*Tompkins* v. *Tompkins, supra,* 83 Cal.App.2d 71.)

## The 1955 Buick

The trial court found the Buick to be community property. The uncontradicted testimony of the wife was that a 1950 Studebaker, which she inherited from her father, was applied to the purchase price of $3,143.42 as a "trade-in," an allowance of $900 being made therefor. This testimony was not found by the court to be false nor was it inherently improbable. It was not impeached or contradicted by other testimony or evidence. Being evidence that the Studebaker was acquired by bequest or descent, the contradictory evidence that would have been supplied by the presumption that such property was community property was not applicable. As to such trade-in allowance the finding that it was community property is totally unsupported. The uncontradicted testimony of the wife was that the balance of the purchase price was paid from "community funds" and that the title was taken in their "joint names." The appellant admits in her complaint that the moneys contributed towards the balance of the purchase price beyond the trade-in allowance were community property, and there is sufficient evidence to sustain the implied finding that to the extent of this contribution the automobile was community property. Property partly acquired through separate and partly through community funds continues to maintain such classification in proportion to the separate and community property invested, unless the property is so commingled that it is impossible to determine one from the other in which case the whole will be deemed to be community property. (*Estate of Fellows,* 106 Cal.App. 681 [289 P. 887]; *Faust* v. *Faust,* 91 Cal.App.2d 304 [204 P.2d 906].) Here the exact amount of the funds allocable to separate and community property which were used to purchase the Buick can be readily traced and ascertained. There was no evidence, however, as to the present value of the Buick. It must therefore be presumed at the commencement of the suit that it was worth $3,143.42, the amount paid for it. (*Gudelj* v. *Gudelj, supra,* 41 Cal.2d 202, at p. 211.) The trade-in allowance of $900 being the separate property of the wife she is entitled to said contribution as separate property. The trial court was entitled to conclude that the difference between $3,143.42 and $900, to wit,

504

$2,243.42 was community property. Accordingly, the sum of $2,243.42 must be credited to community and $900 to the wife's separate property.

### Lot B, Tract 219, Peninsula Gardens

The trial court in its decree declared this property to be community, although it acknowledged therein that such property was "heretofore deeded to her by Joseph Mears as her sole and separate property." The trial court may have intended by this language to award the lot to the wife as her separate property as is indicated in its memorandum of decision. While such a memorandum may not be used to impeach or modify the decree, it may be noted and may serve as a guide where the meaning of the judgment is unclear. (*Odlum* v. *Duffy*, 35 Cal.2d 562 [219 P.2d 785]; *Oldis* v. *La Societe Francaise*, 130 Cal.App.2d 461 [279 P.2d 184].)

The record is uncontradicted that the lot was purchased from funds which the wife inherited from her father, and the husband is making no claim thereto. Furthermore, both parties acknowledge in their briefs that the lot is the separate property of the wife.

### The Two Poodle Dogs

There is sufficient evidence in the record to support the court's findings that the dogs were community property. They were acquired after marriage with funds borrowed and repaid out of community earnings. The testimony was that the purchase price for the two dogs was $250, and in the absence of other evidence as to their value, such sum is to be taken as their value and credited to community.

### Sterling Silverware and Lenox China

The court found these items to be community property, although after so finding it used the following language, to wit: "which belonged to Mrs. Mears before marriage." The wife testified that these were owned by her before marriage and the husband admitted that they were. This is sufficient to sustain a finding that they were the wife's separate property. There is no evidence in the record that the status of these articles was changed to community property by agreement, understanding or intention. While the court's memorandum is not part of the judgment, it indicates that the court considered these items to be separate property and, coupled with the above quoted language, explains the ambiguous language which appears to declare the property to be

community property but apparently intends to find that it is separate property.

### The 1951 Studebaker Automobile

The finding that this automobile was community property is sustained by the evidence which indicates that it was acquired after marriage with joint funds derived from their respective earnings. Furthermore, the appellant admits in her complaint that it was community property. There was, however, no evidence of its purchase price or value. Such a finding as to value was necessary in order to enable the court to arrive at the computation required in order to divide the community property equally.

### The Paint Business

This business was acquired with the sum of $4,000 which the husband and wife borrowed from the wife's father. It is the general rule that money borrowed on personal security by a husband and wife is community property. (*Mosesian* v. *Parker*, 44 Cal.App.2d 544 [112 P.2d 705]; *Guerin* v. *Guerin*, 152 Cal.App.2d 696 [313 P.2d 902].) The presumption afforded by Civil Code, section 164, as to the status of property acquired after the marriage together with the wife's statement ''it belongs to me and my husband'' is sufficient to sustain the implied finding that the said business was community property. There is nothing in said finding, however, to indicate what valuation the court placed on said business. The husband testified that the business was worth $3,000 and that it was a losing business. An owner may testify as to its value. (*Long Beach etc. Dist.* v. *Stewart*, 30 Cal.2d 763 [185 P.2d 585, 173 A.L.R. 249].) This was sufficient to sustain an implied finding that the value of said business was worth $3,000. The wife's testimony that her husband had told her at one time that he had been offered $7,500 for the business was inadmissible evidence because evidence of offers to buy or sell property is improper. (*Redwood City etc. School Dist.* v. *Gregoire*, 128 Cal.App.2d 766 [276 P.2d 78]; *People* v. *La Macchia*, 41 Cal.2d 738 [264 P.2d 15]; *City of Santa Ana* v. *Harlin*, 99 Cal. 538 [34 P. 224].) While the testimony was not objected to, such testimony would not support an inference that the property was worth $7,500 as against the implied finding that it was worth $3,000 based on proper evidence in the record. Accordingly, the sum $3,000 must be credited to community.

### The Excel Agency

 The court declared that the partnership interest in this employment agency, subject to its liabilities, to be community property, and ordered it to be sold, the net proceeds to be divided equally between the parties. The uncontradicted testimony of the wife was that during coverture she inherited $1,500 from her father which she contributed towards the formation of the Excel Agency, a copartnership, with a third party who contributed a like sum. As we have seen, the community property presumption is not applicable to the amount of $1,500 so inherited, and hence such presumption cannot be used to contradict or impeach this testimony. The testimony is not improbable. It must be accepted as true in the absence of a specific finding that the testimony was false. The rents, issues and profits from separate property and the increase in value thereof are separate property under Civil Code, section 163 (*Huber* v. *Huber, supra,* 27 Cal.2d 784) and as such are not subject to the community property presumption under Civil Code, section 164. The purchase and investment of the partnership interest is directly traceable, by uncontradicted and unimpeached evidence, to the said inheritance, hence, it became the wife's separate property. (*Gudelj* v. *Gudelj, supra,* 41 Cal.2d 202.) There was further uncontradicted testimony by the wife that no profits had been derived from said business, nor was any salary taken by her. She did testify that in "six months or so" the business "would give enough to support herself." She also testified that her services were worth $300 to $500, or $200 to $400 per month. The husband testified that he had nothing to do with the business and was never advised as to the status of its affairs. There is no evidence of the nature of the partnership agreement, if any, nor of any agreement between the husband and wife that the partnership interest was to be held as community property. The profits and earnings of a business, as well as the enhanced value thereof, conducted by a spouse as her separate property may, however, become community property as to that part of such profits, income or enhancement in value which results from the spouse's personal ability, initiative and industry. The income from such separate business is allocable to community or separate property in accordance to which it is allocable to the spouse's efforts or his or her capital investment. The proper method of making such allocation is to deduct from the total earnings of the business the value of the spouse's

services to it. The remainder, if any, represents the earnings attributable to the separate property invested in the business. (*Gilmore* v. *Gilmore*, 45 Cal.2d 142 [287 P.2d 769].)

### 704 Distel Drive, Los Altos and Furniture Therein

 The court found this home and the furniture, furnishings, fixtures and effects therein to be community property; ordered it sold and directed that the proceeds be divided equally. The wife admitted in her complaint that 91.2 per cent of the home, and 55 per cent of the furniture was community property. There is ample evidence in the record to sustain the finding that all of this property was the community property of the parties. The purchase of this property resulted from the earnings of the spouses and contributions from separate property the bulk of which came from the husband's pension payments. The testimony of the husband that these pension payments "went into the pot" and that the said furniture was purchased with "community funds"; and the wife's testimony that the house "was ours" and that it was "community property" in addition to her admission that 91.2 per cent of the house and 55 per cent of the furniture constituted community property are sufficient to sustain the court's findings. In addition, the separate and community property have been so commingled as to make segregation impossible, thus giving rise to the presumption that the property was community. The trial court was entitled to rely on this presumption.

### Fifteen Shares Varian Associates

 The court determined that this stock was community property. The uncontradicted and unimpeached testimony of the wife was that $189.17 of the purchase price came from the proceeds of the sale of furniture which she inherited from her father and $85.53 from community funds. In her complaint the wife admitted that the community property contribution was 31 per cent. In view of the principles hereinabove alluded to, the court should have allocated to separate and community property the respective percentage of the contributions to the purchase price. There was no evidence of the value of said stock, hence the value must be determined to be the price paid, to wit, $272.70.

### The Loans

The court decreed that there be "distributed" to the wife the sum of $3,800, being the balance due on the sum of $4,000 borrowed from the wife's father; to the wife, the sum of $200

loaned by her to the husband; and to Mrs. Coons, the balance due her in the sum of $1,800 for money loaned. The decree ordered that these sums be paid from the proceeds of the community property sold. It was apparently the court's finding that these items constituted community debts. The finding that the $1,800 obligation is a community debt owing Mrs. Coons is supported by the evidence, as is the $3,800 obligation to the wife's father although there was a conflict as to whether the obligation had been discharged. ▮▮ If the latter obligation is a community debt, it was not a community asset and should have been ordered paid to the estate of the wife's father or the personal representative thereof. If it is treated as an asset, it is the separate property of the wife, if the inference can be drawn that she is entitled to it as an heir without the benefit of administration. ▮▮ Before a division of community property can be made legally, the nature of the debts owing by the spouses must be definitely ascertained. If it be determined as a fact that they are community debts, then they should be deducted from the gross value of the community property before a division is made. (*Rethers* v. *Rethers,* 140 Cal.App.2d 28 [294 P.2d 968]; *Williams* v. *Williams, supra,* 146 Cal.App.2d 307.)

▮▮ The $200 which the court declared was money borrowed from the wife by the husband apparently refers to the $700 loan from the wife's separate property of which $500 was repaid, leaving said balance. There is no evidence as to the purpose of the loan. ▮▮ In *McKay* v. *McKay,* 184 Cal. 742, 746 [195 P. 385], the court stated: "It is the settled rule that the fact of the receipt by the husband of his wife's money presumptively makes him her debtor and imposes upon him the legal duty of returning it to her, . . ." ▮▮ The $200 should come from the husband's separate estate or upon the division of the community property be a charge thereon.

▮▮ The court made no provision in its decree for the sum of $450 advanced by the wife from her separate property to the community for the purposes of vacation trips together. The wife's uncontradicted testimony was that the money was advanced "because we didn't have enough money in our joint checking account." ▮▮ If a spouse uses separate funds for family expenses at a time when the community funds are exhausted, in the absence of an agreement to the contrary or evidence of an intention to make a gift, he or she is entitled to reimbursement when the account is replenished. (*Kenney* v. *Kenney, supra,* 128 Cal.App.2d 128, at p. 136; *Hill* v. *Hill,*

82 Cal.App.2d 682 [187 P.2d 28].) ▮▮▮ Accordingly, the decree should make provision for reimbursement out of community property before division of said advances.

### Attorney's Fees and Costs

▮▮▮ The allowance of attorney's fees and costs is in the sound discretion of the court (Civ. Code, § 137) and its conclusion will not be disturbed unless there is a showing of abuse of discretion (*Primm* v. *Primm,* 46 Cal.2d 690 [299 P.2d 231]). No such abuse is shown here.

▮▮▮ The contention was urged by respondent at the time of argument that because the respondent has appealed from certain portions of the judgment only, she has voluntarily accepted the benefits of the other portions of the judgment not attacked so as to bar a prosecution of this appeal.

▮▮▮ The general rule is that a party is not entitled to accept the benefits of a judgment and then appeal from it. (*Schubert* v. *Reich,* 36 Cal.2d 298 [223 P.2d 242]; *Turner* v. *Markham,* 152 Cal. 246 [92 P. 485].) This rule is subject to the qualification that the acts relied upon to show such acquiescence must be clear, " 'unconditional, voluntary or absolute.' " (*Duncan* v. *Duncan,* 175 Cal. 693, 695 [167 P. 141].) The rule has the further qualification that in order to defeat the appeal it must be shown that the appellant has received and accepted benefits from the judgment to which he would not be entitled in the event of a reversal of the judgment. (*Browning* v. *Browning,* 208 Cal. 518 [282 P. 503].) ▮▮▮ "Where the different portions of a judgment are severable, a party by voluntarily accepting the fruits of one portion thereof does not necessarily estop himself to attack other and severable portions thereof upon appeal. [Citation.] But if a party to a judgment accepts payment or satisfaction of a part thereof which is favorable to him, and that part is of such a character that the part adverse to him cannot be reversed without affecting the part which is in his favor and requiring the reversal of that part also, the party so accepting the fruits of a part of the judgment in his favor is estopped from prosecuting an appeal from those parts which are against him. [Citations.]" (*Preluzsky* v. *Pacific Co-operative etc. Co.,* 195 Cal. 290, 293 [232 P. 970]; *People* v. *Roath,* 62 Cal.App. 2d 241 [144 P.2d 648].) ▮▮▮ In *Gudelj* v. *Gudelj, supra,* 41 Cal.2d 202, at page 214, the court said, citing *American Enterprise, Inc.* v. *Van Winkle,* 39 Cal.2d 210, 217 [246 P.2d 935]: "As to severability, '[T]he test of whether a portion

of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is whether the matters or issues embraced therein are the same as, or interdependent upon, the matters or issues which have not been attacked.' ''

The appellant has not appealed from the portions of the judgment awarding her the poodle dogs, the sterling silver and china set, the $3,800 obligation owing to her father, the $200 owing to her by the husband, nor the award of the Studebaker to her husband, nor the payment of the $1,800 obligation to Mrs. Coons. We have, however, considered each of these items on this appeal because the trial court's determination of what was separate and what was community property was necessary in order to make an equal division of the community property. As pointed out above the judgment was ambiguous in some respects. The appellant has urged in her appeal that there has not been an equal division of the community property. The different portions of the judgment are clearly severable. As seen from our review of the evidence as to each of these items of property, they are not ''interdependent upon'' each other except only insofar as they affect the computation which would be necessary in order to make an equal division of the community property. It is only '' [w]here the judgment represents the complete award allowed to the prevailing party by the court and *disposes of the whole issue,* or in other words, where the provisions of a judgment are interdependent, the appellate tribunal cannot properly reverse the judgment as to the part complained of and permit the remainder to stand. [Citation.] It is where a party accepts the benefit of an award and appeals for more relief *in kind* that he must seek a reopening of the whole issue or be precluded by the amount awarded. [Citation.]'' (*People* v. *Roath, supra,* 62 Cal.App.2d 241, 244-245.) In the present case the part adverse to appellant can be reversed without affecting the part which is favorable.

The judgment is reversed as to the portions of the interlocutory decree of divorce appealed from and the cause is remanded for a new trial upon the issues relating thereto, with directions upon said retrial to take evidence as to the value of the community property awarded in the decree from which an appeal was not taken in order that proper credit be given to the respective spouses in making an equal division thereof.

Bray, P. J., and Duniway, J., concurred.