[Civ. No. 21826. First Dist., Div. One. May 19, 1965.]

JOAN LOVETRO, Plaintiff and Appellant, v. GENE W. STEERS et al., Defendants and Respondents.

Miller, Osborne, Miller, Bartlett & Tallett, Miller, Osborne, Miller & Tallett and O. Leland Osborne for Plaintiff and Appellant.

William A. Sullivan and Samuel L. Fendel for Defendants and Respondents.

MOLINARI, J.—Plaintiff, Joan Lovetro, appeals from a judgment in her favor for $2,000, plus $500 in attorney's fees in an action wherein she sought to recover the sum of $9,500 plus interest and attorney's fees upon a promissory note executed by defendants, Gene W. Steers and Geraldine Steers, to plaintiff and her deceased husband, Sam Lovetro, as joint tenants.[1]

Defendants admitted the execution of the note but denied that there was due thereon any more than the sum of $1,782.85, which sum they tendered to plaintiff, and upon its being refused, deposited with the clerk of the court. The position taken by defendants was that the Lovetros had executed a written release purporting to release defendants from all obligations on the note excepting the sum of $2,000, against which defendants sought to offset the sum of $217.15 as an indebtedness owing from Sam to defendants. With respect to the purported release plaintiff contended that it was a forgery as to her and that it was executed without her knowledge or consent. With regard to the alleged indebtedness of $217.15, plaintiff asserted that it was her husband's personal obligation and that no claim on account thereof was made in the probate of his estate. The position taken by plaintiff at the pretrial conference was that $6,000 had been paid on account of the $25,000 principal of said note, leaving a balance of $19,000; and that the release executed by Sam was not binding on her one-half interest in said balance, that is, the sum of $9,500.

The factual background developed at the trial showed that Sam and Gene had been partners in an auto parts business;

_____

[1] When referred to jointly, Sam Lovetro and his widow, Joan, will be designated as "the Lovetros." As individuals, Sam Lovetro will be referred to as "Sam" and his widow as "Joan" or "plaintiff." A similar set of references will apply to defendants: When referred to together they will be designated as "the Steers" or as "defendants"; individually, they will be referred to as "Gene" and "Geraldine."

that Sam sold his interest to Gene; that pursuant to the partnership dissolution agreement the Steers executed a promissory note dated October 1, 1958, by which they promised to pay to the order of Sam and Joan, "as joint tenants with the right of survivorship," the principal sum of $25,000 with interest at the rate of 6 per cent; that between November 19, 1958, and November 19, 1959, the Steers made monthly payments of $500 totalling the sum of $6,000; that following the dissolution Sam continued to work for Gene as a bookkeeper; that during the course of his employment Sam took money from Gene without the latter's consent; that when the shortages were discovered by Gene, he and Sam agreed that the monies taken should be credited against the balance due on the promissory note; that an amount was agreed upon by Gene and Sam based upon an independent audit; that thereupon Gene and Sam executed an instrument entitled "Mutual Release" and a letter acknowledging that the remaining indebtedness due on the note was $2,000;[2] and that the release, although purporting to be an agreement between Gene and Sam, contains in addition to their signatures one purporting to be the signature of Joan.

At the trial plaintiff called a handwriting expert who testified that the signature on the release purporting to be Joan's was not her signature. In addition, Joan testified that it was not her signature and that the release was executed without her knowledge and consent. The record discloses further that Sam died on March 11, 1961, that his will was probated, that his entire estate devolved to Joan, that the estate was closed, and that no claim was filed by defendants against the estate.

■ Before adverting to the trial court's findings it should be here pointed out that it is the established law in California that in order for a promissory note which is held in joint tenancy to be extinguished, either in part or in full, the consent of both of the obligees must be obtained. (*Stark* v. *Coker*, 20 Cal.2d 839, 844-845 [129 P.2d 390].) In *Stark*, the wife of the plaintiff, who, with her husband, was named as a joint tenant on a promissory note executed by the defendant corporation, had entered into an accord and satisfaction with the defendants, whereby the $12,000 note was to be discharged for $3,000. The plaintiff had no knowledge of the purported accord and satisfaction and did not authorize it. In allowing the plaintiff to recover on the note, the Supreme

---

[2]This figure was arrived at by allowing credit for the $6,000 which had previously been paid and by crediting the monies taken by Sam.

Court held that Civil Code section 1475,[3] which provides that "An obligation in favor of several persons is extinguished by performance rendered to any of them, except in the case of a deposit made by owners in common, or in joint ownership, which is regulated by the title on deposit," was not applicable under the circumstances there presented. It should be here noted that in *Cober* v. *Connolly*, 20 Cal.2d 741 [128 P.2d 519, 142 A.L.R. 367], decided by the Supreme Court just a month prior to *Stark*, section 1475 was held to be applicable where payment on a note was made to one of the three payees thereof. *Stark* makes no reference to *Cober*. The two cases are clearly distinguishable, however, since *Cober* did not involve a note held in joint tenancy but one in which the payees were merely joint payees.

In the light of the rule announced in *Stark*, defendants could only prevail on some theory which would permit them to urge the subject release in discharge of the obligation even though plaintiff did not sign the release or agree to its terms. The theories advanced by defendants for this purpose were (1) that the promissory note was in actual fact a community asset, the note having been executed in the form of joint tenancy as a matter of convenience, and (2) that plaintiff by her conduct led defendants to believe that Sam had authority to act for her in any dealings involving the note, and that he was therefore her agent in executing the release. As to both of these theories, the trial court found in favor of defendants.[4]

---

[3]Unless otherwise indicated, all statutory references are to the Civil Code.

[4]The pertinent findings of the trial court are as follows:

"1. . . . The Court further finds that the partnership business was the community property of the plaintiff and her husband, Samuel J. Lovetro, now deceased, and that the note was executed in joint tenancy form as a matter of convenience.

"5. That the promissory note sued upon herein was an asset of the community property between plaintiff and her late husband, Samuel J. Lovetro. The plaintiff allowed her husband to make arrangements for the mode of payment of the note, and when the defendants ceased making the installment payments as provided in the note, accepted her husband's explanation therefore. It appears from all of the evidence in the case that the promissory note was an asset of the community and that with the consent of the plaintiff the husband exercised the privilege of representing both parties and [certainly]* [L. B. D. j.] led the defendants to believe that he had the authority to do so.

"12. That it is true that the plaintiff's husband had full authority to represent plaintiff and himself in the execution of the aforesaid release and agreement that the principal sum due on said note as of March 4,

---

*Bracketed word crossed out in original.

The major issue on appeal therefore is whether or not these findings are supported by the evidence contained in the record. We deal first with the theory that the subject note was in actuality an asset of the community.

■ When property is conveyed to a husband and wife as joint tenants, the form of the conveyance is such as to destroy the statutory presumption that the property is community even though the consideration for such conveyance consists of community funds or assets; such an instrument creates a tenancy in which the interests of the husband and wife are separate property. (*Siberell* v. *Siberell*, 214 Cal. 767, 773 [7 P.2d 1003]; *Mears* v. *Mears*, 180 Cal.App.2d 484, 500 [4 Cal.Rptr. 618].) ■ However, the form of the instrument under which a husband and wife hold title is not conclusive as to the status of the property; property acquired as joint tenants may be shown to be actually community property or the separate property of one spouse according to the intention, understanding or agreement of the parties. (*Gudelj* v. *Gudelj*, 41 Cal.2d 202, 212 [259 P.2d 656]; *Socol* v. *King*, 36 Cal.2d 342, 345 [223 P.2d 627]; *Tomaier* v. *Tomaier*, 23 Cal.2d 754, 758-759 [146 P.2d 905]; *Delanoy* v. *Delanoy*, 216 Cal. 23, 26 [13 P.2d 513]; *Mears* v. *Mears, supra*, p. 500.) In *Socol*, we find the following language: "When there is an oral or written agreement as to the ownership of the property [citations], or where such an understanding may be inferred from the conduct and declarations of the spouses [citations], it is true that the terms of the [joint tenancy] deed are not controlling. But where such circumstances do not exist, a true joint tenancy is created by a conveyance to husband and wife in that form, although the property is purchased with community funds [citations]." (P. 346.)

■ The evidence presented against the presumption arising from the form of the deed is not restricted solely to evidence of the source of the funds used to purchase the property but may consist of any substantial credible and relevant evidence showing the intention, understanding or agreement of the parties. (*Gudelj* v. *Gudelj, supra*, p. 212; *Socol* v. *King, supra*, p. 346; *Mears* v. *Mears, supra*, p. 500.) ■ The presumption, however, cannot be overcome by testimony of a hidden intention not disclosed to the other grantee or trans-

---

1962, was the sum of $2,000.00; and that the conduct of the plaintiff herself was such to permit the defendants to believe that plaintiff's husband had full authority to act as her agent in the accomplishment of any settlement and/or release pertaining to the ultimate payment due on said promissory note.''

feree at the time of the execution of the conveyance or instrument in question. (*Gudelj* v. *Gudelj, supra,* p. 212; *Socol* v. *King, supra,* p. 346.) ▊ Whether the evidence is sufficient to overthrow the presumption arising from the form of the instrument is a question of fact. (*Gudelj* v. *Gudelj, supra,* p. 212; *DeBoer* v. *DeBoer,* 111 Cal.App.2d 500, 504 [244 P.2d 953].) Subsequent to *Socol,* a number of decisions emanating from the District Courts of Appeal have analyzed the particular facts before them in order to determine whether a finding that the joint tenancy presumption had been rebutted found support in the evidence. (Among these are: *Jenkins* v. *Jenkins,* 147 Cal.App.2d 527 [305 P.2d 289]; *Bowman* v. *Bowman,* 149 Cal.App.2d 773 [308 P.2d 906]; *Blankenship* v. *Blankenship,* 212 Cal.App.2d 736 [28 Cal.Rptr. 176]; *Taliaferro* v. *Taliaferro,* 217 Cal.App.2d 211 [31 Cal.Rptr. 690].) Of particular interest, insofar as the present case is concerned, are the *Jenkins* and *Blankenship* cases. In *Jenkins,* the spouses acquired property in joint tenancy with funds derived from the husband's earnings. The parties took title in joint tenancy at the suggestion of friends and the escrow clerk to avoid probate proceedings in the event of the death of either of them. Neither of the spouses knew the difference between joint tenancy and community property, and they had had no discussion or previous understanding concerning the taking of title in joint tenancy. The appellate court held that the evidence was sufficient to justify a finding that title was taken in joint tenancy for the sole purpose of facilitating its transfer upon the death of one of the spouses. The reviewing court stated as follows: "If the evidence is sufficient to convince the court that the parties had no agreement and no intention to alter the community character of the property it may properly be determined that it remains community property notwithstanding the fact that title was knowingly taken in joint tenancy. [Citations.]" (P. 529.)

In *Blankenship,* two parcels of property were acquired with community funds by joint tenancy deeds. At the trial the plaintiff husband admitted that he did not know " 'what joint tenancy property is' " or " 'what community property is' "; that he never discussed with his wife how title to either of the parcels was to be taken, and that he did not learn that title was taken in joint tenancy until he was so advised by his counsel. (P. 740.) He admitted that he intended each parcel in turn to be a home for himself and his wife. The defendant wife testified that there were no written

agreements between the plaintiff and herself relating to the title to their community property and that up to the time of their present difficulties " 'there was never any question about property. We assumed that we owned everything together. Both of our names were on everything — cars included.' " (P. 741.) There was also testimony of other witnesses to the effect that both of the spouses referred to the respective parcels as " 'our home,' " " 'our house' " and " 'our property.' " (P. 741.) These facts were held by this court to constitute substantial evidence of the intention and understanding of both parties to continue to hold the real property in question as their community property despite the joint tenancy form of the deeds. Justice Sullivan, writing for this court, stated as follows: "We are presented here with the everyday situation of a husband and wife purchasing property with community funds and taking title as joint tenants.... [I]t is common knowledge that this form of ownership is adopted in order to provide for automatic and inexpensive survivorship on death. When the conduct of the spouses shows that they regard the property as their marital property and where, as here, it appears that they never actually understood characteristics and effect of a joint tenancy, there is a sound basis for a trier of fact to conclude that they never intended to change the character of their property." (P. 742.)

Before turning to the facts of the present case in the light of the foregoing principles, we should here point out that we are bound by the trial court's finding that the subject note was community property if there is substantial evidence in the record to support such finding. (*Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 500-501.) The finding of a trial court that property is either separate or community in character is binding and conclusive on the appellate court if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences; and if a trial court determines that a presumption has been overcome such determination will not be disturbed on appeal if there is substantial conflict in the evidence, or, although there is no conflict, if different inferences might fairly be drawn from the evidence. (*In re Rauer's Collection Co.,* 87 Cal.App.2d 248, 256 [196 P.2d 803]; *Rogers* v. *Rogers,* 86 Cal.App.2d 817, 820 [195 P.2d 890]; *Mears* v. *Mears, supra,* pp. 500-501; *Veronin* v. *Veronin,* 131 Cal.App.2d 298, 300 [280 P.2d 173]; *Stauffer* v. *Stauffer,* 135 Cal.App.2d 515, 518-519 [287 P.2d 518].)

The evidence in the record on this issue is as follows: Plaintiff testified that she and her husband at no time agreed, either orally or in writing, to hold the promissory note in some manner other than the form in which it was written, and that she was ignorant of the legal distinction between title taken in joint tenancy and that taken in community property; the consideration furnished for the note consisted of Sam's partnership interest; the installment payments made on the note were never divided into separate shares, but were deposited in the Lovetros' joint commercial banking account, which account was used by the Lovetros to pay family living expenses; the testimony by plaintiff that "this money that was being paid on this note for the sale of his [Sam's] partnership interest, that was all considered part of the family pot"; and plaintiff's affirmative answer to the question: "As far as you were concerned, however, the sale of this business of your husband's interest in this auto parts business, that money was for both you and your husband.... And because you were husband and wife?"

In addition to this testimony the trial court had before it the presumption that Sam's partnership interest was community property. The record is devoid of any evidence as to whether such interest was community or separate property. In the absence of any such evidence, and in the light of Joan's testimony, the trial court was entitled to presume that such interest was community property since all property which is acquired after marriage, other than that specified in sections 162 and 163, is community property and the burden is on the party seeking to establish that such property is in fact separate. (§ 164; *Falk* v. *Falk*, 48 Cal. App.2d 762, 768 [120 P.2d 714]; *Kenncy* v. *Kenney*, 128 Cal.App.2d 128, 135 [274 P.2d 951].) In the present case no claim was made by plaintiff that the partnership interest was separate property. The record shows that Sam and Joan were married for 25 years, that Sam went into business with Gene about two years before he died, that they were in business together about a year, and that Sam had been in the auto parts business between one and two years prior to going into business with Gene. From this evidence the trial court was entitled to infer that the partnership business was acquired during the marriage. We conclude, therefore, that Joan's testimony, when coupled with the presumption that the partnership interest was community

property, constitutes substantial evidence of the intention of both Sam and Joan to continue to hold the subject note representing the proceeds from the sale of such interest as their community property despite the joint tenancy form of the note.

We find no merit, moreover, to plaintiff's argument that because many of plaintiff's acts on which the court relied in determining that the Lovetros held the note as community property took place after the execution of the release and concerned the proceeds of the note rather than the note itself, therefore these acts cannot be considered by the court for the purpose of rebutting the joint tenancy presumption. In many of the cases which we have reviewed with respect to the issue here before us, the court found the property in question to be a community asset based in part on evidence relating to the acts or declarations of the spouses concerning not only the property itself, but also its source, and its use. Furthermore, in many of these same cases, the acts and declarations relied on by the court took place after the spouses had acquired the subject property. In other words, although the crucial issue in these cases involves the intention of the parties as to the manner in which they were holding the particular property, there can be no doubt that the acts or declarations of the parties prior to, contemporaneous with, and subsequent to the acquisition of this property, and concerning as well the source and proceeds of the property, can be of probative value in determining such intent.

 Before passing to the second phase of this appeal, we wish to deal briefly with plaintiff's contention that the court could not properly find that the subject note was held by the Lovetros in a manner other than as joint tenants when defendants admitted that the note was one in joint tenancy. This position is without merit because its premise is unsound. Nowhere in their pleadings or in the record do we find an admission to this effect by defendants. Of course, defendants in their answer do admit the fact that the note "was and is made payable . . . to plaintiff and Samuel J. Lovetro, the husband of said plaintiff, as joint tenants with right of survivorship." This statement is, however, simply a statement of what the document states on its face. As such it does not prevent defendants from showing that plaintiff and her husband did not in reality intend to hold this note in some other manner than that which it recites. As to this issue defendants have made no admission and the court was justified therefore in considering it an issue in the case.

Adverting to the agency issue, we find that the trial court made two findings in this respect: (1) That Sam had full authority to represent himself and Joan in the execution of the subject release and agreement, and (2) that Sam had the ostensible authority to execute these instruments by reason of Joan's conduct. ▮ With respect to the first finding, since the subject note was community property, Sam, as the manager of the community personal property (§ 172), could therefore properly execute the subject release and agreement. "The position of the husband, in whom the management and control of the entire community estate is vested by statute (Civ. Code, §§ 161a, 172, 172a), has been frequently analogized to that of a partner, *agent,* or fiduciary. [Citations.]" (Italics added; *Fields* v. *Michael,* 91 Cal.App.2d 443, 447 [205 P.2d 402]; *Vai* v. *Bank of America,* 56 Cal.2d 329, 338-339 [15 Cal.Rptr. 71, 364 P.2d 247].) In *Grolemund* v. *Cafferata,* 17 Cal.2d 679, 683-684 [111 P.2d 641], it was held that section 172, which gives the husband management and control with power of disposition of community personal property, subjects the entire community personalty, with the exception of the wife's earnings as provided by section 168, to any and all contracts of the husband, the only limitation upon the husband being to refrain from making a gift of such property without consideration. It was there held that since the community property is liable for the husband's debts, including his torts, a husband could pay out the personal property in compromise or satisfaction of a tort claim against him, such payment not being a payment without consideration. (See *Nichols* v. *Mitchell,* 32 Cal.2d 598 [197 P.2d 550], wherein the community property was held liable for the satisfaction of a judgment on a promissory note executed by the husband; and see *Estate of Mendenhall,* 182 Cal.App.2d 441, 445 [6 Cal.Rptr. 45].) Illustrative of the husband's power with respect to community personal property is the holding in *Gudelj* (41 Cal.2d 202), that a husband may apply the community's share of the profits from his separate property interest in a cleaning business, as well as his separate share of the profits, to reduction of the debt incurred in purchasing such interest.

▮ In the light of the foregoing authorities, upon finding that the subject promissory note was community property, the trial court was entitled to find that Sam had the right without Joan's express authority or consent to enter into

the release and agreement in partial extinguishment of the note in satisfaction of the tort committed against Gene.

Although it was unnecessary to the trial court's decision, since Sam had the authority by law to do what he did with respect to the note, the trial court further found that Joan, by her conduct, had led the Steers to believe that Sam had the authority to act for her in any dealings involving the note and that he was, therefore, her agent in executing the release and agreement. It is clear from plaintiff's testimony that she at no time affirmatively conferred authority upon her husband to act on her behalf in executing a release of defendants' obligation. Furthermore, plaintiff's testimony is uncontroverted that until her husband's death, she did not know that there had been any change in defendants' original obligation contained in the promissory note for $25,000. The only evidence indicating that Sam had authority to execute a release on behalf of plaintiff is the evidence of plaintiff's inaction as to all matters involving the promissory note— plaintiff never saw the note prior to Sam's death; all of the details concerning the note and its terms were arranged by Sam; plaintiff never went to the bank to inquire whether the payments were being made on time; after payments on the note ceased in November 1959, plaintiff made no demand of any kind on defendants for payment of the note; nor did she make any inquiry at the bank concerning defendants' failure to make their monthly payments. Furthermore, plaintiff testified that Sam took care of all the business affairs during their marriage. In addition, Gene testified that in all his business matters involving the Lovetros, he most generally "dealt with Sam," and that as far as he observed, Sam was the head of the family as far as financial matters were concerned. However, both plaintiff and Gene testified that while Gene and Sam were working together plaintiff occasionally came down to the place of business and helped Sam with his bookkeeping.

Bearing in mind the limited quantity and quality of this evidence, and in addition the fact that any substantial evidence to support the trial court's findings compels us to uphold the judgment, we consider the law in California on the subject of the existence of an agency between husband and wife. ▉ To begin with, we note that the distinguishing features of an agency are representative character and derivative authority. (*Store of Happiness* v. *Carmona & Allen, Inc.*, 152 Cal.App.2d 266, 269 [312 P.2d 1104].) ▉ The relationship can be established either by agreement between the

agent and the principal, that is, a true agency (*De Leonis* v. *Etchepare*, 120 Cal. 407, 409 [52 P. 718]), or it can be founded on ostensible authority, that is, some intentional conduct or neglect on the part of the alleged principal creating a belief in the minds of third persons that an agency exists, and a reasonable reliance thereon by such third persons. (*Walsh* v. *American Trust Co.*, 7 Cal.App.2d 654, 660 [47 P.2d 323]; *County First Nat. Bank* v. *Coast Dairies & Land Co.*, 46 Cal. App.2d 355, 363-364 [115 P.2d 988]; see also § 2317.) ▮ In the case of dealings which involve a husband and wife, it is well established that an agency cannot be implied from the marriage relation alone. (*Williams* v. *Tam*, 131 Cal. 64, 67 [63 P. 133]; *Brown* v. *Oxtoby*, 45 Cal.App.2d 702, 708 [114 P.2d 622].) However, it is also true that much less evidence is required to establish a principal and agent relationship between husband and wife than between nonspouses. (*Wagoner* v. *Silva*, 139 Cal. 559, 563 [73 P. 433]; *Stegeman* v. *Vandeventer*, 57 Cal.App.2d 753, 759 [135 P.2d 186].)

In *Wagoner*, the plaintiff husband settled a matter concerning trespass on lands owned by the plaintiff husband and wife as cotenants. The court held that the settlement made by the husband, without the knowledge, consent or acquiescence of his wife, bound only his interest as a cotenant. Concerning the issue of whether her husband was her agent, the court said: ''There is, however, nowhere to be found in the record any evidence that plaintiff Josephine H. Wagoner was taken into account by any of the parties to the transaction, so far as the damage and payment therefor were concerned. There is no evidence that she was consulted or spoken to by any one, or was represented by any one, in any of the negotiations as to the damage, or received any money paid by defendant, or consented to or acquiesced in any payment made by him, or in anything done by her husband or by Swinford or by defendant, or had any knowledge of what they or either of them had done in respect to any payment for the damage.'' (P. 561.)

▮ In spite of the language of the *Wagoner* case, it seems that under some circumstances the wife's inaction throughout dealings which involve her property can be used as the basis for a finding that the husband was her agent in these dealings and that his actions therefore were binding on her and her property. In the case of *Snodgrass* v. *Parks*, 79 Cal. 55 [21 P. 429], the plaintiffs brought a quiet title action against the defendants, who had contracted to pur-

chase the subject land, but had abandoned the contract because of their inability to pay the purchase price. One of the contentions made on appeal by the wife of one of the defendants was that as to her the contract of sale was never rescinded. Although there was no evidence of the husband's authority to act for the wife, the Supreme Court nevertheless held that the finding that he had such authority was supported by the evidence that all of the transactions between the plaintiffs and the defendant wife were carried on, on her part, through her husband, and by the fact that "his authority to act for her throughout is not denied by either of the defendants." (P. 60.)

A second case in which the court considered the existence of an agency between husband and wife based on the wife's inaction throughout all dealings with a third person is the case of *Puget Sound Lumber Co.* v. *Krug*, 89 Cal. 237 [26 P. 902]. This action was brought to recover from the wife the value of lumber alleged to have been purchased by her from the plaintiff through the agency of her husband. Judgment had been rendered in favor of the plaintiff; however, on motion of the defendants, the trial court granted a new trial on the ground of insufficiency of the evidence to prove agency of the husband. The Supreme Court affirmed the trial court's order, but discussed in its opinion the evidence necessary to establish an agency between husband and wife. The facts of this case were that the defendant wife owned certain land as her separate property; that the husband and wife resided on this land; and that the husband alone used, cultivated and improved the land to raise grapes for winemaking. At various times in the past, the defendant husband had ordered lumber from the plaintiff, in his own name, to be used for the construction of buildings on his wife's property. The plaintiff, believing that the husband was the owner of the land, the improvements, and the winemaking business, delivered to him the lumber sued for and charged it to him individually. The husband then became insolvent and the plaintiff brought an action to recover the amount owing from the wife. The evidence disclosed that for the 15-year period during which the plaintiff was acquainted with the parties the wife had allowed the husband to use the property as his own; that he had availed himself of the proceeds of it, pocketed these proceeds, and never accounted to her for them; that she never asked him to do so; that he had conducted a wine business on said property using it as his own; and that he had done all of these things with her consent and knowledge. The

Supreme Court stated that the circumstantial evidence substantially tended to prove precedent original authority of the husband from the wife to erect the fixtures above mentioned upon her land, and for that purpose to purchase the lumber sued for.

In the present case Joan's testimony that Sam took care of all their business affairs during the marriage and that all the details concerning the note had been arranged by him, when coupled with the fact that she knew of the nature of the note and that payments were being made thereon in installments, her failure to make inquiry as to whether the payments were being made on time, and her failure to make inquiry when she became aware that such installments were not being made, was sufficient, we believe, to warrant the inference that Sam had authority to execute the aforementioned release and agreement on Joan's behalf.

One other argument which plaintiff makes in relation to defendants' liability on the note is that since Geraldine is not made a party to the release nor is her name mentioned therein, the release is not operative as to her and she therefore remains liable for the full balance due on the note. In support of this position, plaintiff cites section 1543, which provides that "A release of one of two or more joint debtors does not extinguish the obligations of any of the others, unless they are mere guarantors; nor does it affect their right to contribution from him." Plaintiff has, however, misconstrued this code section. Its proper interpretation is that a release of the one joint debtor does not extinguish the obligation of any of the other joint debtors *to pay so much of the debt as was not paid by the released obligor.* In other words, the release does not extinguish *the remainder of the obligation* as to the coobligors. (See *Armstrong* v. *Hayward,* 6 Cal. 183, 186; *French* v. *McCarthy,* 125 Cal. 508, 512 [58 P. 154].) Plaintiff asks for an interpretation of this section which would allow an obligee double recovery against joint debtors. Such a construction is obviously erroneous and flies in the face of section 1474, which provides that "Performance of an obligation, by one of several persons who are jointly liable under it, extinguishes the liability of all."

The remaining point which plaintiff raises on this appeal concerns the propriety of the trial court's determination that the deposit by defendants of $1,782.85 with the clerk of the court stopped the running of interest on that sum from the time of deposit until judgment. The facts as to this issue are

as follows: Defendants in their answer claimed a $217.15 credit against the balance of the note by virtue of certain merchandise which had been sold by defendants to Sam and which had not been paid for at the time of his death. Based therefore on the $6,000 payment, the release, and the alleged $217.15 claim, defendants calculated that the amount owing on the note was $1,782.85. Pursuant to an affidavit by defendants and an order by the court, this amount was deposited by defendants with the clerk of the court for the account of plaintiff. As to this alleged $217.15 credit, plaintiff claimed and the trial court so found that since defendants failed to present a claim against Sam's estate for that amount, the estate having been closed on February 21, 1962, defendants were not entitled to the claimed offset in this action. In addition, however, the court found "That it is true defendants in good faith deposited with the Clerk of the above entitled Court the sum of One Thousand Seven Hundred Eighty Two and 85/100 Dollars [$1,782.85] on or about the 25th day of April, 1962, upon their good faith belief that this represented the arithmetical difference between the aforesaid offset of $217.15 and the sum due on the note in the sum of $2,000.00." Accordingly, the judgment ordered "That plaintiff have judgment against the defendants in the sum of Two Thousand Dollars [$2,000.00] with interest thereon at the rate of six per cent [6%] per annum from the 4th day of March, 1962, to the date of entry of judgment herein, except that no interest shall be charged for the period April 25, 1962, to the date of entry of judgment herein upon the sum of One Thousand Seven Hundred and Eighty Two and 85/100 [$1,782.85], which sum has heretofore been deposited with the Clerk of the Court." It is plaintiff's position that the affidavit and order of the court constituted an offer by defendants to perform their obligation, but that since it was only an offer of partial performance, it did not stop the running of interest on the obligation. The bases of plaintiff's contention are sections 1485, 1486 and 1504.[5]

---

[5]These code sections provide as follows:

§ 1485: "An obligation is extinguished by an offer of performance, made in conformity to the rules herein prescribed, and with intent to extinguish the obligation."

§ 1486: "An offer of partial performance is of no effect."

§ 1504: "An offer of payment or other performance, duly made, though the title to the thing offered be not transferred to the creditor, stops the running of interest on the obligation, and has the same effect upon all its incidents as a performance thereof."

The general rule is stated in the article on Interest in 28 California Jurisprudence, Second Edition, section 6, as follows: "A sufficient tender of the amount due stops the running of interest." (See *Ferrea* v. *Tubbs,* 125 Cal. 687, 689 [58 P. 308]; *Wadleigh* v. *Phelps,* 149 Cal. 627, 642 [87 P. 93]; *Sills* v. *Siller,* 218 Cal.App.2d 735, 744 [32 Cal.Rptr. 621]; *Rottman* v. *Hevener,* 54 Cal.App. 474, 484 [202 P. 329]; § 1504.) In footnote 2 of the article the authors state that section 1504 is a statutory statement of this rule. (To the same effect see *Wadleigh* v. *Phelps, supra,* p. 642.) It is also the general rule, however, that a tender of less than the full amount due will not stop the running of interest since a tender, in order to be effective, must include everything to which the creditor is entitled. (5 A.L.R. 1226, 1230; 28 Cal.Jur.2d, *supra; San Pedro Lumber Co.* v. *Reynolds,* 111 Cal. 588, 598 [44 P. 309]; *Colton* v. *Oakland Bank of Savings,* 137 Cal. 376, 382-383 [70 P. 225]; *Rauer's Law etc. Co.* v. *Sheridan Proctor Co.,* 40 Cal.App. 524, 525 [181 P. 71]; *Mosee* v. *Firemen's Ins. Co. of Newark,* 87 Cal.App. 473, 477 [262 P. 436]; *Pacific Mail S.S. Co.* v. *Western Pac. R. Co.,* 251 F. 218, 222 [163 C.C.A. 374].) In *Rauer's,* it is stated that "Nothing short of the full amount due the creditor is sufficient to constitute a valid tender, and the debtor must at his peril offer the full amount." (P. 525.)

In the present case the trial court was apparently relying upon the following statement in *Holland* v. *Paddock,* 142 Cal. App.2d 534, 539 [298 P.2d 587]: "After rejection of a tender made in *good faith* the creditor loses his right to collect further interest, costs and attorney's fees [citations]." (Italics added.) As indicated by its finding the court below interpreted this principle to mean that as long as a party tenders what he in good faith believes is the correct amount such tender is sufficient to stop the running of interest. In the light of the general rule hereinabove cited this interpretation is incorrect since it is immaterial that the party making the tender did not know the correct amount or believed that the amount tendered by him was sufficient. "He acts at his peril, and must see to it that the amount tendered is large enough. Any mistake in this respect is his own misfortune." (5 A.L.R. 1232.) In the instant case defendants attempted to offset the balance they claimed was due on the note with the alleged $217.15 indebtedness of Sam's. The trial court properly determined that they were not entitled to offset this amount in this action. Having

elected to tender an amount less than the amount due they did so at their own peril. We are satisfied, moreover, that the statement in the *Holland* case was directed to the "good faith" making of the tender itself and not to the *amount* of the tender.

It follows from what we have said that the judgment should be corrected insofar as interest is concerned. It is therefore ordered that the judgment be corrected so as to allow plaintiff interest on the balance of $2,000 due on the note at the rate of 6 per cent per annum from the 4th day of March 1962 to the date of the entry of judgment. As so corrected, the judgment will stand affirmed. Costs on appeal are awarded to defendants.

Sullivan, P. J., and Sims, J., concurred.