[Civ. No. 22542. First Dist., Div. One. May 24, 1966.]

HERMAN J. BECK, Plaintiff, Cross-defendant and Respondent, v. MARY MARGRETTA BECK, Defendant, Cross-complainant and Appellant.

Lally & Martin and Thomas W. Martin for Defendant, Cross-complainant and Appellant.

Smith & Burstein and Jack B. Burstein for Plaintiff, Cross-defendant and Respondent.

SIMS, J.—Defendant and cross-complainant wife, who was awarded an interlocutory decree of divorce from plaintiff and cross-defendant husband, and $100 per month alimony, has appealed from that part of the decree which awards to the husband, as a portion of the community property, one-half of the funds on deposit in a certain savings account which stands in her name alone. She expressly attacks the portion of the findings of fact and conclusions of law upon which that provision of the decree is predicated as unsupported by the evidence, and contends that the record compels a finding that the entire sum on deposit is her separate property.

More specifically, the wife asserts that the sum on deposit represents her one-half share of the proceeds of the sale of certain real property which was given to the couple as, and held by them as, joint tenants. The husband contends (1) that although the conveyance was couched in terms of joint tenancy, the real property was received by the couple and held by them as community property; (2) that, regardless of the status of the real property, the proceeds were received and held by them as community property; and (3) that in any event, the decree properly awards him one-half the sum on deposit, because if each party was a true joint tenant in the property at the time of its sale, that status attached to all of the proceeds of the sale and could not be defeated by the unilateral act of one joint tenant in appropriating a portion of the proceeds to her individual account without the consent of the other. The wife counters this last contention by asserting that the evidence conclusively shows that the husband agreed to and acquiesced in a division of the proceeds, and recognized her right to hold the portion now represented by the savings account as her separate property.

It is concluded, for the reasons hereinafter set forth, that the sum in dispute never attained the character of community property, and that the case should be reversed and remanded for a determination of whether that fund retained its status as property held in joint tenancy, or represents the wife's share of the proceeds as her separate property.

The facts in dispute and the conflicting inferences which may be drawn from all of the evidence may be reviewed more appropriately in connection with the applicable law. The unimpeached elements of the framework and background on which this picture of marital discord is delineated are as follows: The parties married August 2, 1929, and have one child, an adult daughter. After a stormy marriage they sepa-

rated for the last time September 30, 1962. Their first connection with the property, which ultimately produced the fund which is the vortex of this controversy, was in 1948 or sometime before, when, at the request or the suggestion of the husband's father, they came to Fairfield to settle on a 19-acre plot owned by him. This property subsequently was improved with a three-room apartment and a three-bedroom home and some outbuildings by the efforts of the husband as applied with materials and other labor purchased originally with funds supplied by the father and subsequently augmented by a small loan after the couple acquired title. By deed recorded December 28, 1953, which recites, ''Hans Beck grants to Herman J. Beck and Mary M. Beck, husband and wife, as joint tenants, . . .'' the father conveyed the property to the couple.

Thereafter the husband engaged in business as a grading and paving contractor, and ''made a living off of it . . . for a number of years'' until he met with reversals around 1960 and 1961. He accumulated machinery, equipment and tools which were fully paid for by 1958 either from the proceeds of the business, money given him by his father for the house, or money inherited after his father's death in September 1954. In November 1963 he estimated the value of this personal property at $10,000, subject to encumbrances of $1,500. He admitted it could not be replaced for that sum, and that it might cost $20,000 to $30,000, to do so. A construction company manager in June 1964 appraised the older equipment at $14,400 and new additions at $12,500. The extent of the unpaid balances on the latter was not determined. All money he received was deposited in the joint commercial account of husband and wife. She kept the books up through the first quarter of 1961. She would draw checks for most of the bills but he would write ''pocket checks'' and advise her. No balance was kept in the checkbook, and the account was drawn on indiscriminately for both business and living expenses.

In March 1958 the wife opened a savings account in her sole name, and deposited therein, in addition to the sums to which reference is hereinafter made, sums received by her as an administratrix fee, from an inheritance, from income on family property, and from her daughter for the care of the latter's child.

In October 1958 approximately 16 acres of the property received in 1953 was sold for $3,500 per acre. On October 10, 1958, $22,393.68 was deposited in the joint commercial account

representing the down payment on the property; and on November 7, 1958, $11,762.32 was deposited in the wife's savings account of which sum $11,128.10 was acknowledged by her to represent one-half of the net down payment. On January 22, 1959, $17,584.51 was received and deposited in the joint commercial account as the second payment on the land. The wife noted the receipt of this sum in the checkbook, along with deductions for moneys paid the real estate agent and an attorney, and drew a check for $8,241.27, representing one-half the balance, to her own order and deposited it in her savings account on January 23, 1959. On August 12, 1959, $8,000 was withdrawn from the savings account and a deposit in the same sum was credited to the joint account on August 21st. On September 18, 1959, a final payment was included in $18,345.59 deposited in the joint account on that day. Thereafter on November 10, 1959, $15,000 was deposited in the wife's savings account, which sum, according to her represented repayment of an $8,000 advance, and $7,000 representing one-half the final payment less credit for income taxes and miscellaneous expense. This account was closed by a withdrawal of $25,218.79 on October 16, 1962, six days after the husband filed his complaint for divorce. It is conceded that the sum so represented was deposited in another account and is subject to disposition in accordance with the final judgment of the court.

Meanwhile by deeds recorded on July 28, 1959, August 24, 1959, and September 23, 1959, and bearing revenue stamps representing considerations of $2,500, $3,000 and $2,500, respectively, three parcels of real property, each improved with a residence, were conveyed to "Mary M. Beck, a married woman." These units were concededly purchased with funds from the joint commercial account. A "ten plan" account was opened later in the wife's name alone in a separate bank to keep the rentals separate, and expenses which had previously been paid from the joint account, were then paid from that account. As of November 1963 there was $24,028.73 still owing on these units, and an insignificant balance in the rental account. According to the wife she only receives $75 per month after making payments on the outstanding loans. The 1961 income tax return reflects net income of $1,413.93 after payment of interest but before taking $1,403.61 for depreciation. From the former sum she still had to pay the principal portion of the loan payments. The husband valued these units at $3,500 each in November 1963. According to him, the wife

just went ahead and bought these units and he had no objection to their going in her name because he wanted to keep the rentals separate from the construction business. He testified "it wasn't for the simple reason I was going to take my money and she was going to take hers. Still going to work together," and "I still figured it was community property." He was impeached by contradictory testimony in his deposition where he had denied that he ever took the position that the rental units belonged to him and acknowledged that he considered them her separate property. The wife testified that the units were purchased with her husband's consent and encouragement in order to save some of the proceeds of the sale of their property.

Sometime thereafter, but before the husband conveyed the residence and remaining property to his wife, a right-of-way, or right of access, was sold for $3,600 or $3,640. This money was placed in the joint commercial account.

By deed dated August 3, 1961, and recorded November 20, 1961, the remaining 2½ acres including the improvements were conveyed by husband and wife to "Mary Beck, as her sole and separate property." There is some conflict in the testimony as to whether the husband was motivated in making this conveyance in an attempt to effect a reconciliation with his wife or pursuant to an agreement whereby she would release to him the certificates of ownership for the machinery and equipment used in his business; or whether, according to the wife, he gave it to her "out of a clear sky" because it was not worth anything because of the highway realignment. He testified that it was worth $45,000 at the time of the 1963 hearings, and was free and clear of any encumbrances.

The record reflects that in addition to the foregoing property the parties accumulated household furniture, furnishings, fixtures and appliances, a 1948 Chevrolet pickup truck, and a 1956 Chevrolet BelAir automobile, and the husband's tools and personal effects. It further shows that the wife in February 1961 or 1962 purchased a house trailer in her own name with funds from the savings account for approximately $4,200. The savings account shows such a withdrawal February 28, 1961. A conflict in the testimony as to which party instigated this purchase is rendered moot by the fact that title and ownership of the trailer, as distinguished from the bank account which was the source of the funds for its purchase, were not put in issue by either party.

The case was originally tried in November 1963. After the

court rendered its decision and findings of fact and conclusions of law were signed and filed, the court reopened the case in response to the wife's motion for new trial by an order which recited "that findings, conclusions and judgment herein by [sic] and they are VACATED AND SET ASIDE, insofar as the same pertain to designation of separate properties and community properties of the parties, and insofar as they pertain to division of community properties." A further hearing was held in June 1964. Thereafter the court rendered its decision, and findings, conclusions and judgment were signed, filed and entered.

The respective claims to property and the disposition thereof as reflected by the pleadings and actions of the court are as follows: (1) The residence and the 2½ acres on which it is located was claimed by the husband to be community property. The wife denied this allegation and alleged that it was her separate property in her cross-complaint. The court on both occasions sustained the wife's contentions and awarded this property to her as her separate property.

(2) The three rental units were also claimed to be community property by the husband, and to be her separate property by the wife. In each judgment the court found these parcels to be community property, but awarded the whole thereof to the wife.

(3) There was no controversy regarding the household furniture, furnishings, fixtures and appliances. Each party alleged they were community property. The court so found and awarded the whole to the wife after each hearing.

(4) A controversy raised by the pleadings over the status of the 1956 Chevrolet was resolved against the wife's claim of separate property and in favor of husband's allegation that it was community property. As such it was awarded to the wife by each decision.

(5) The pickup truck was alleged by both to be and found to be community property and awarded to the husband by each decision.

(6) The equipment, machinery and assets of the grading and paving business were alleged by both parties to be community property, and in its first opinion the court so found and awarded them to the husband. On rehearing the court found that they were the separate property of the husband and awarded them to him as such. The wife has not challenged this variance from the admissions of the pleadings, because she seeks to rest on an alleged agreement whereby she relinquished

any right in this property at the time of the 1958 sale, in return for his agreement that she should hold the residence and other property standing in her name alone as her separate property.

(7) The tools, clothing, personal equipage and effects of the husband were not expressly referred to in the pleadings but were considered to belong to the husband in both opinions and awarded to the husband in the findings, conclusions and judgment.

(8) In his original complaint husband alleged that his wife had withdrawn funds from bank accounts without his knowledge or consent, and sought to enjoin her from drawing on the bank accounts. No mention was made of the savings account in her name. The first mention of the account was in her cross-complaint in which she alleged that her separate property consisted of the residence, the three rental units, the 1956 Chevrolet and a bank account. In his answer to the cross-complaint husband denied the foregoing and alleged that the items set forth were either community property or his separate property. In each decision the court found that funds on deposit in the savings account were community property. In the first decision $15,000 was awarded to the husband and the balance to the wife. In the second, one-half of the sum on deposit was awarded to each party, and the findings, conclusions and judgment followed the latter decision.

In each decision, and in the final findings, conclusions and judgment each party was ordered to pay his own attorneys' fees and court costs. Parenthetically it may be noted that the joint commercial account apparently was divested of all funds prior to the separation. The husband in 1962 opened an account for his business in another bank, which in turn was closed before the trial.

The wife's appeal is solely from that portion of the decree which gave the husband a half interest in the sum on deposit in her own name. Since she was awarded the rental units and the 1956 Chevrolet she has no reason to attack the finding that they were community property rather than her separate property as she alleged. Her acquiescence in the rejection of her claim that the business and its assets was community property has been noted above. The husband, by his failure to appeal, has accepted the finding that the residence was the wife's separate property and its award to her. He has also tacitly approved the award of the rental units, the household furniture, etc., and 1956 Chevrolet to his wife as her share of

the community property. The issues are narrowed to the status of the deposit held in the wife's name, and the facts and conclusions relating to the other items of property are only material insofar as they shed light on this account and the source of the funds of which it consists.

### *The status of the real property before sale*

The rules governing the creation of, recognition of, or rejection of joint tenancy ownership of property conveyed to or held by a husband and wife by an instrument nominally reciting that form of tenure are well established. Controversy is engendered by the application of these rules to the myriad factual situations to which they are applied. This court has recently reviewed and applied these rules in *Lovetro* v. *Steers* (1965) 234 Cal.App.2d 461 [44 Cal.Rptr. 604]. The principles set forth therein will serve as guideposts for the traveler through the maze of conflicting contentions raised by the parties to this case.

■ "When property is conveyed to a husband and wife as joint tenants, the form of the conveyance is such as to destroy the statutory presumption that the property is community even though the consideration for such conveyance consists of community funds or assets; such an instrument creates a tenancy in which the interests of the husband and wife are separate property. (*Siberell* v. *Siberell*, 214 Cal. 767, 773 [7 P.2d 1003]; *Mears* v. *Mears*, 180 Cal.App.2d 484, 500 [4 Cal. Rptr. 618].)" (234 Cal.App.2d at p. 468; and in addition to the cases cited see: *Machado* v. *Machado* (1962) 58 Cal.2d 501, 506 [25 Cal.Rptr. 87, 375 P.2d 55]; *Donovan* v. *Donovan* (1963) 223 Cal.App.2d 691, 696 [36 Cal.Rptr. 225]; *Blankenship* v. *Blankenship* (1963) 212 Cal.App.2d 736, 739-740 [28 Cal.Rptr. 176]; *Benam* v. *Benam* (1960) 178 Cal.App.2d 837, 842 [3 Cal.Rptr. 410]; *Bowman* v. *Bowman* (1957) 149 Cal. App.2d 773, 775 [308 P.2d 906]; *Barba* v. *Barba* (1951) 103 Cal.App.2d 395, 396 [229 P.2d 465].)

■ "However, the form of the instrument under which a husband and wife hold title is not conclusive as to the status of the property; property acquired as joint tenants may be shown to be actually community property or the separate property of one spouse according to the intention, understanding or agreement of the parties. (*Gudelj* v. *Gudelj*, 41 Cal.2d 202, 212 [259 P.2d 656]; *Socol* v. *King*, 36 Cal.2d 342, 345 [223 P.2d 627]; *Tomaier* v. *Tomaier*, 23 Cal.2d 754, 758-759

[146 P.2d 905]; *Delanoy* v. *Delanoy*, 216 Cal. 23, 26 [13 P.2d 513]; *Mears* v. *Mears, supra,* p. 500.)'' (*Id.,* and in addition to the cases cited see: *Machado* v. *Machado, supra,* 58 Cal.2d at p. 506; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at p. 740; *Bowman* v. *Bowman, supra,* 149 Cal.App.2d at pp. 775-776; *Schuster* v. *Schuster* (1957) 150 Cal.App.2d 650, 653 [310 P.2d 481].)

■ "The evidence presented against the presumption arising from the form of the deed . . . may consist of any substantial credible and relevant evidence showing the intention, understanding or agreement of the parties. (*Gudelj* v. *Gudelj, supra,* p. 212; *Socol* v. *King, supra,* p. 346; *Mears* v. *Mears, supra,* p. 500.)'' (*Id.,* and in addition to the cases cited see: *Machado* v. *Machado, supra,* 58 Cal.2d at p. 506; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at p. 740; *Benam* v. *Benam, supra,* 178 Cal.App.2d at p. 845; *Schuster* v. *Schuster, supra,* 150 Cal.App.2d at p. 653; *Bowman* v. *Bowman, supra,* 149 Cal.App.2d at p. 775.)

■ "Whether the evidence is sufficient to overthrow the presumption arising from the form of the instrument is a question of fact. (*Gudelj* v. *Gudelj, supra,* p. 212; *DeBoer* v. *DeBoer,* 111 Cal.App.2d 500, 504 [244 P.2d 953].)'' (*Id.,* p. 469; and in addition to the cases cited see: *Machado* v. *Machado, supra,* 58 Cal.2d at p. 506; *Benam* v. *Benam, supra,* 178 Cal.2d at p. 844; *Schuster* v. *Schuster, supra,* 150 Cal. App.2d at p. 653.)

■ "The finding of a trial court that property is either separate or community in character is binding and conclusive on the appellate court if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences; and if a trial court determines that a presumption has been overcome such determination will not be disturbed on appeal if there is substantial conflict in the evidence, or, although there is no conflict, if different inferences might fairly be drawn from the evidence. (*In re Rauer's Collection Co.,* 87 Cal.App.2d 248, 256 [196 P.2d 803]; *Rogers* v. *Rogers,* 86 Cal.App.2d 817, 820 [195 P.2d 890]; *Mears* v. *Mears, supra,* pp. 500-501; *Veronin* v. *Veronin,* 131 Cal.App.2d 298, 300 [280 P.2d 173]; *Stauffer* v. *Stauffer,* 135 Cal.App.2d 515, 518-519 [287 P.2d 518].)'' (*Id.,* p. 470; and in addition to the cases cited see: *Donovan* v. *Donovan, supra,* 223 Cal.App.2d at pp. 695-696; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at p. 741; *Schuster* v. *Schuster, supra,* 150 Cal.App.2d at p. 654.)

The presumption of a joint tenancy from the form of the conveyance cannot be rebutted merely by showing the source of the funds used to acquire the property. (*Donovan* v. *Donovan, supra,* 223 Cal.App.2d at p. 696; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at p. 740; *Benam* v. *Benam, supra,* 178 Cal.App.2d at p. 844; *Bowman* v. *Bowman, supra,* 149 Cal.App.2d at p. 775; *Barba* v. *Barba, supra,* 103 Cal.App.2d 395, 396.) Nevertheless, the source of the property, though not conclusive, is a factor to be considered along with all other evidence. (*Lovetro* v. *Steers, supra,* 234 Cal.App.2d at p. 472; and see *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at p. 740; and *Bowman* v. *Bowman, supra,* 149 Cal.App.2d at p. 776.) In this case the husband directs attention to the fact the home was constructed with his separate funds which had been received as a gift from his father, and that the original land came from his father. The separate funds and the community property, if any, in the form of labor which the husband invested in the improvements in the property are not the source of the funds in controversy here. They are merged in the 2½ acres which the court found to be the wife's separate property and awarded to her. No attack was made on this part of the judgment, and it may be sustained not only by the form of the deed to the wife, but also by the evidence of an alleged agreement that she should have the residence, and the husband, his business.

Insofar as the remaining acreage is concerned there is not a scintilla of evidence to show that the grantor-donor intended other than the joint tenancy expressed on the face of the deed. ■ The provisions of the Civil Code not only recognize that a husband and wife may hold property as joint tenants as distinguished from community property (§ 161), but also expressly provide that property acquired by either spouse after marriage by gift becomes the separate property of that spouse (§§ 162 and 163).

■ In the course of establishing that the husband was aware of the form of the deed by which he and his wife acquired the property, counsel for the wife repeatedly asked the husband if he knew that the father deeded the property to them as joint tenants. In the course of objections and hesitation, before an affirmative answer was evoked, the witness acknowledged that he understood the question, but also volunteered "but that is community property." That portion of his answer was properly stricken on motion. ■ The husband's suggestions that it be reinstated must be rejected,

because the presumption that the property is received in joint tenancy cannot be overcome by testimony of a hidden intention or understanding which is not disclosed to the other grantee or transferee. (*Machado* v. *Machado, supra,* 58 Cal.2d at p. 506; *Lovetro* v. *Steers, supra,* 234 Cal.App.2d at pp. 468-469; *Donovan* v. *Donovan, supra,* 223 Cal.App.2d at p. 697; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at p. 740; *Benam* v. *Benam, supra,* 178 Cal.App.2d at pp. 844-845; *Bowman* v. *Bowman, supra,* 149 Cal.App.2d at p. 775.)

In his deposition the husband was asked if he considered the three pieces of rental property which were acquired in his wife's name "her separate property," and he answered "Yes." After this was brought out on cross-examination he was interrogated on redirect as to his knowledge of the meaning of the term. He testified that he was not used to using the term "separate property" before his deposition; that he imagined it meant "part of it belonged to one and the rest of it belonged to somebody else"; that at the time of the deposition he did not know there was any difference between the words "community" and "separate"; and that the difference meant to him: "Community property would be two people are joining, separate would be individual property."

■ Such lack of knowledge may be a significant factor when taken in connection with other facts. (See *Lovetro* v. *Steers, supra,* 234 Cal.App.2d at p. 469; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at pp. 740-741; *Bowman* v. *Bowman, supra,* 149 Cal.App.2d at pp. 776-777; but cf. *Benam* v. *Benam, supra,* 178 Cal.App.2d at p. 843.) It must, however, be related to some particular act or omission of the party seeking to overcome the presumption, or be connected in some way with an act or omission of the party claiming under the form of the conveyance before it can have significance. Otherwise, it has no more probative force than the hidden intention or understanding heretofore noted.

During the time the parties owned the land they had it planted in hay and leased and payments were made in connection therewith—whether to the wife or the husband or to both is left to conjecture, so that fact can be of little significance.

■ The wife was examined concerning a discussion had with her husband prior to the sale of the 16 acres in 1958. She testified that at that time she stated to him: "Now in the event we sell this field, let's use our heads and make something of it," and "This is all we probably ever will have, and let's make the best of it." The husband seizes upon this portion of

the alleged conversation (disregarding the latter part of the narration which purports to establish his assent to a division of the proceeds)[1] as establishing a first person plural, both possessive and nominative, which permits the inference that the reference was to collective action as husband and wife rather than as joint tenants. (See *Lovetro* v. *Steers, supra,* 234 Cal.App.2d at p. 471; *Blankenship* v. *Blankenship, supra,* 212 Cal.App.2d at p. 741; *Bowman* v. *Bowman, supra,* 149 Cal. App.2d at pp. 776-777.) In each of the foregoing cases the source of the property or the funds used to pay off the indebtedness incurred for its acquisition was concededly community property, not, as in this case, a gift. The admitted declarations of the wife are prospective in operation and do not throw any light on her individual, much less any mutual intention, understanding, or agreement regarding the status of the property. As a declaration of future intent as to mutual interests in the proceeds of the sale the statements cannot be divorced from their content, which as a whole, rebuts any inference that the proceeds were to be held as community property.

The husband has not adverted to, nor has a diligent search of the record revealed any other acts or declarations of the parties or other facts or circumstances which would tend to show that the parties intended, understood, or agreed that the real property itself was to be held other than as joint tenants as recited in the deed. "Since there was no evidence of a common understanding or an agreement the presumption was not overcome. (*Gudelj* v. *Gudelj*, 41 Cal.2d 202, 212-213 [259 P.2d 656]; *Socol* v. *King*, 36 Cal.2d 342, 345-346 [233 P.2d 627].)" (*Machado* v. *Machado, supra,* 58 Cal.2d 501,

---

[1]The full testimony is as follows: "When this field was sold, did you have any discussion with your husband concerning that sale? A. Yes, I did. I said, 'Now, in the event we sell this field, let's use our heads and make something of it.' I said, 'This is all we probably ever will have, and let's make the best of it.' And I said, 'It has been proven that the contracting business—you are not making anything at it.' I said, 'Let's use our heads and see what we can do.' And so he said to me, 'I'm not going to let them say they run me out of business,' is his very words, and I quote him. He said, 'What we will do'—he said, 'You take half of the money derived from this sale, and I'll take half,' and he said, 'You can do what you want with yours, and I will do what I want with mine.' Q. This was agreeable with you, was it? A. Well, he was—he usually done whatever he wanted to do, so— Q. (Interposing) You agreed? A. So I agreed to it. I suggested also being that we weren't getting any younger that we should get employment somewhere where we could work together and wouldn't have to work so hard. But he continued wanting to continue in his contracting business. He said he wasn't going to let anybody say they run him out of business."

506; accord: *Donovan* v. *Donovan, supra,* 223 Cal.App.2d 691, 696; *Benam* v. *Benam, supra,* 178 Cal.App.2d 837, 845; *Barba* v. *Barba, supra,* 103 Cal.App.2d 395, 396; *Schindler* v. *Schindler* (1954) 126 Cal.App.2d 597, 605 [272 P.2d 566].)

### The status of the proceeds of sale

The wife testified that the husband agreed she should take one-half the proceeds as her separate property (see fn. 1, *supra*). In corroboration of her own testimony she offered that of her daughter, her brother, and a friend to show that the husband acknowledged that he had agreed she should hold one-half the proceeds for her own account. The husband denied that he ever agreed to divide the cash proceeds of the sale with his wife, and stated, ''We didn't have any understanding at all.''

The wife's testimony was rejected by the trial court. A consistent interpretation of its findings and conclusions may be rationalized on the theory that the proceeds of the sale were community property and that this status followed their investment into the rental units and in the withdrawal and redeposit in the wife's savings account. (The alleged agreement of 1961 by which the wife secured the deed to the residence and surrendered any claim to the business was apparently accepted by the court. It precludes the status of community property from attaching to such of the equipment, machinery and assets of the business as were purchased from the joint account either before or after the deposit of the proceeds.)

In support of such implied finding that the proceeds were community property the husband refers to the wife's declarations which have been already reviewed. In their content they do not warrant an inference of an intention, undertaking, or agreement to so hold the proceeds. His denial that any understanding at all existed serves to strengthen the wife's contention that the proceeds retained the character of the property from which they were derived.

When asked on cross-examination if at the time of the sale he intended that he and his wife would each have half of the proceeds of the sale, he answered, ''Not necessarily. We were still married and I figured it should be considered as community property''; and ''It could go into the account, but we could be drawing savings on it.'' This evidence only demonstrates the intent and understanding of the declarant. In the absence of any showing that it was communicated to the cotenant, it cannot, as has been demonstrated above in connec-

tion with the status of the real property, serve to destroy the respective separate interests of the parties which theretofore existed.

Reference is also made to the wife's testimony in reference to the filing of joint income tax returns. It appears therefrom that the parties did file a joint income tax return each year up to and including 1961, although in 1962, at the time of the preparation of the 1961 return, the husband desired to file a separate return and was dissuaded when he learned it would cost more. These returns reflect the interest paid on the savings account in the wife's name and the rent received on the three rental properties which were acquired in 1959 in her name. In acknowledging that the parties listed their income together and made a joint return the wife stated, "Yes. I thought we were working together all the time"; and "I thought we were working together until the day he left." She also gave an affirmative answer to the question, "You worked together with him in the business all along, didn't you?" This testimony is certainly of great probative effect in determining the status of the business and the income therefrom, and throws some light on the consensual investment in the rental units. It does not illuminate the more troublesome search to determine the true character of the remaining proceeds of the joint tenancy property. They could have worked together and yet had separate investments. In fact, such was their agreement after 1961 in connection with the business and the residence. ■■■ The inclusion of the interest, a portion of which is admittedly earned on the wife's separate property, in a joint tax return does not furnish a touchstone which will enable the assayer to determine the quality of the fund from which it was produced. Given the election to file a joint return all income of the spouses is included regardless of the nature of the source. (See *Estate of Neilson* (1962) 57 Cal.2d 733, 744, fn. 2 [22 Cal.Rptr. 1, 371 P.2d 745].)

The husband further contends that the wife's concealment of her appropriation of one-half the proceeds of the sale is evidence of her belief that she was not entitled to the sums she deposited. The evidence is conflicting on whether or not there was such concealment, and it is hereinafter examined in connection with a review of the joint tenancy status of the proceeds. ■■■ Assuming, however, that such concealment was established, it in and of itself cannot have any probative effect in establishing that the parties intended, understood, or agreed that the proceeds should be held as community

property rather than as joint tenants. The same considerations apply to the evidence of the self-serving declarations of the husband in which he accused her of stealing his money.

He also complains of alleged inconsistencies in the wife's claims. She claimed the rental units as her separate property; whereas, he asserts, if her claim to the half of the proceeds which she appropriated as her separate property as cotenant is correct, the one-half left in the joint account and the investment made therewith in the rental units should be all the separate property of the husband. Whatever merit there may be in the equities of this claim it does not serve to establish a change in the status of the proceeds. The court did find such a change in regard to the character of the rental units. Inquiry into the correctness of this determination is concededly foreclosed by the failure of either party to appeal from that portion of the decree awarding the rental units to the wife as a part of her share of the community property. Consideration of the wife's alleged inconsistency in claiming that a tractor purchased with that half of the proceeds of sale which remained in the joint account was community property, whereas consistency would require a finding it was the husband's separate property, is similarly unproductive. Nor is any light generated by reference to the fact that the wife segregated her receipts from her inheritance and family property in her savings account; whereas, the husband consistently placed all his receipts, including gifts and inherited funds, in the joint account. ▮ Finally her bookkeeping and domination of financial affairs, if established, may demonstrate opportunity to divert funds from the joint account, but cannot establish the identity of those funds as community, joint, or the separate property of either party.

In deference to the findings of the trial court, consideration should be given to the theory, not raised by the parties, that the joint account constituted community property, and that the deposit of the proceeds of the sale of the joint tenancy property therein transmuted them into community property. (See *Grolemund* v. *Cafferata* (1941) 17 Cal.2d 679, 683 [111 P.2d 641]; *Fountain* v. *Maxim* (1930) 210 Cal. 48, 51 [290 P. 576]; *Mason* v. *Mason* (1960) 186 Cal.App.2d 209, 212-213 [8 Cal.Rptr. 784]; *Falk* v. *Falk* (1941) 48 Cal.App.2d 762, 766-768 [120 P.2d 714].) ▮ The evidence clearly sustains the implied finding, which is implicit in the court's express findings and conclusions, that the joint account in which the defendant deposited all the receipts from his business was

community property. This status would not be destroyed by the occasional deposit of a gift or legacy.[2]

The uncontradicted evidence herein expressly traces the deposits made by the wife back through the joint account to the deposit therein of the payments made on the property. On this state of the evidence it would be erroneous to consider the proceeds of the sale, to the extent they were so traced, as transmuted into community property. (*Huber* v. *Huber* (1946) 27 Cal.2d 784, 791 [167 P.2d 708] ; *Brown* v. *Meredith* (1963) 220 Cal.App.2d 762, 764-765 [34 Cal.Rptr. 153] ; *Hicks* v. *Hicks* (1962) 211 Cal.App.2d 144, 157 [27 Cal.Rptr. 307] ; *Estate of McGee* (1959) 168 Cal.App.2d 670, 677 [336 P.2d 622] ; *Kenney* v. *Kenney* (1954) 128 Cal.App.2d 128, 135-136 [274 P.2d 951] ; *Thomasset* v. *Thomasset* (1953) 122 Cal.App.2d 116, 124-125 [264 P.2d 626].)

It is concluded that the evidence fails to sustain a finding that so much of the proceeds of the sale of the real property which had been held in joint tenancy, as were segregated by the appropriations and deposits made by the wife, ever attained the character of community property. (See *Chamberlain* v. *Chamberlain* (1934) 2 Cal.App.2d 684, 688 [38 P.2d 790].) The findings, conclusions and judgment of the trial court are in error in so holding. In order to determine whether this error is prejudicial it is necessary to examine the status of the deposited funds.

### The status of the funds on deposit in the wife's account

"The proceeds of joint tenancy property, in the absence of contrary agreement, retain the character of the property from which they are acquired [citations]." (*Fish* v. *Security-First Nat. Bank* (1948) 31 Cal.2d 378, 387 [189 P.2d 10] ; accord: *Goldberg* v. *Goldberg* (1963) 217 Cal.App.2d 623,

---

[2]The express findings of the court that the rental units were community property, although not attacked, may be sustained by the evidence. Payments were made out of the joint account. The first two parcels were acquired July 28 and August 24, 1959, respectively. No attempt was made to show what portion, if any, of the one-half of the payments, which had been deposited October 10, 1958 and January 22, 1959, respectively, and which remained after the wife had appropriated her one-half, were on hand or used for the acquisition of those properties. The third parcel was acquired September 23, 1959, five days after the deposit of the final payment for the joint property and over a month and one-half before the wife made the deposit allegedly reimbursing herself for the $8,000 advance and the net amount due her half on the last payment. Here again, however, no attempt was made to trace the funds used for the purchase.

628 [32 Cal.Rptr. 93] ; *Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144, 163; *County of Fresno* v. *Kahn* (1962) 207 Cal.App.2d 213, 216-217 [24 Cal.Rptr. 394] ; *Teutenberg* v. *Schiller* (1955) 138 Cal.App.2d 18, 24 [291 P.2d 53] ; *Estate of Zaring* (1949) 93 Cal.App.2d 577, 580 [209 P.2d 642] ; and see *Estate of Kretschmer* (1965) 232 Cal.App.2d 789, 791 [43 Cal.Rptr. 121].)

There is a conflict in the evidence as to the intent, understanding, and agreement of the parties in respect of the proceeds of sale. The wife, as recounted above (fn. 1) testified that she and her husband agreed that each would take one-half of the proceeds to do with as the recipient might desire. She also testified that she thought her husband made out the check for the $11,128.10 she received on the first payment. She offered the testimony of relatives and a friend to show that the husband had made declarations consistent with her contention. She refers to the fact that the bank statements and income tax returns were available to him, and that he therefore must have known that she withdrew the sums in question, and received and reported the interest received on them.

For his part the husband relies on the evidence reviewed above in connection with his claim that the property was, or in any event, the proceeds thereof were, community property. He contends that even if those facts fail to show that the parties agreed to hold the land or proceeds as community property, they do serve to establish that he never consented to a severance of their respective interests, whatever the character of those interests may have been. As noted, he denied that any understanding was effected as to dividing the proceeds. He further testified that he never knew his wife had withdrawn these sums from their joint account; that he did not know she had deposited them in a separate account until that fact was revealed when she filed her cross-complaint; and that she refused to tell him that such funds existed and advised him they were all expended. He further brought out by the testimony of his daughter and brother-in-law that he had accused her of stealing his money both before and after the divorce suit was filed.

██ Although there are some inconsistencies in the husband's testimony, on the whole it would justify a finding that there was never any agreement that the proceeds of the sale of the joint tenancy land were to be segregated and divided. Under these circumstances one joint tenant is entitled to an accounting from his cotenant who has appropriated the joint

tenancy funds to his own use. (*Machado* v. *Machado, supra,* 58 Cal.2d 501, 506-507; *Fish* v. *Security-First Nat. Bank, supra,* 31 Cal.2d 378, 387; *Wallace* v. *Riley* (1937) 23 Cal.App.2d 669, 677-679 [74 P.2d 800]; and see *Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144, 163.)[3]

The respondent husband contends that since the trial court found that the account was community property, it impliedly rejected the wife's assertion that the parties had agreed to segregate and divide the proceeds. Therefore, he urges, the wife cannot successfully assert this agreement against the husband's right to one-half the proceeds as nonassenting joint tenant. This argument has the advantage of simplicity and would permit a ready affirmance of the judgment for lack of prejudicial error. Further analysis, however, suggests that the matter be remanded to the trial court for its determination.

The funds on deposit were found to be "property acquired by the parties hereto during their marriage otherwise than by gift, devise, descent or damage in a personal injury action." If this conclusion was predicated upon the erroneous belief that either the sale price, or the real property itself was community property, the findings would have been aided by the presumption that all property acquired during marriage, other than that specified in sections 162 and 163 of the Civil Code is community property and by the resulting burden on the wife to establish that the proceeds were separate. (*Lovetro* v. *Steers, supra,* 234 Cal.App.2d 461, 471.) On the other hand, if, as determined herein, the real property and the traceable proceeds thereof must be treated as property held in joint tenancy because of the absence of sufficient evidence to show a contrary intention, understanding, or agreement the burden of proof may still be on the wife (see *Estate of Zaring, supra,* 93 Cal. App.2d 577, 580; *Estate of McCoin* (1935) 9 Cal.App.2d 480, 483 [50 P.2d 114]).

In *Estate of Harris* (1937) 9 Cal.2d 649 [72 P.2d 873] the opinion recites: "We are not willing to subscribe to the theory, in the absence of proof, that it was the agreement of the cotenants, husband and wife, that the husband in purchas-

---

[3]The right to an accounting for separate property which has been misappropriated, as recognized in the foregoing authorities, should be distinguished from attempts to partition separate property held in joint or common ownership which are not generally countenanced in divorce proceedings. (See *Donovan* v. *Donovan* (1963) 223 Cal.App.2d 691, 698 [36 Cal.Rptr. 225]; *Davis* v. *Davis* (1963) 222 Cal.App.2d 691, 693 [35 Cal.Rptr. 281]; *Schindler* v. *Schindler* (1954) 126 Cal.App.2d 597, 605 [272 P.2d 566].)

ing the real property used only his half interest in the joint tenancy funds and took all the real property as his own separate property. Such a holding would in other cases open wide the door of actual fraud to unscrupulous persons and place the burden of proving the retention of an interest in joint tenancy property upon the passive joint tenant rather than upon the person actively transferring the title. This would be most inequitable and work an undue hardship upon the innocent co-owner.'' (9 Cal.2d at .p. 660; and see Peters, P. J. dissenting in *Bliss* v. *Martin* (1946) 74 Cal.App.2d 500, at pp. 515-516 [169 P.2d 61].) There is, however, no presumption one way or the other as to the existence or nonexistence of an agreement to sever the joint tenancy and divide the proceeds. (Cf. *Machado* v. *Machado, supra,* 58 Cal.2d 501, 506-507; *Fish* v. *Security-First Nat. Bank, supra,* 31 Cal.2d 378, 387-388; *Estate of Zaring, supra,* 93 Cal.App.2d 577, 580; *Lieber* v. *Rigby* (1934) 34 Cal.App.2d 582, 583-584 [94 P.2d 49]; and *Chamberlain* v. *Chamberlain, supra,* 2 Cal.App.2d 684, 688; with *Wheeland* v. *Rodgers* (1942) 20 Cal.2d 218, 222-223 [124 P.2d 816]; *Estate of Putnam* (1933) 219 Cal. 608, 612 [28 P.2d 27]; *Estate of Kretschmer, supra,* 232 Cal.App. 2d 789, 791-792; and *Lagar* v. *Erickson* (1936) 13 Cal.App.2d 365, 368-369 [56 P.2d 1287].) █ ▪ In view of the fact that the trial court never evaluated the evidence from the viewpoint of the issues raised and considered on this appeal, the case should be remanded for such consideration. (See *Chamberlain* v. *Chamberlain, supra,* 2 Cal.App.2d 684, 688.)

The record reflects that $26,369.37 (representing $11,128.10 of the $11,762.32 deposited November 7, 1958, $8,241.27 deposited January 23, 1958, and $7,000 of the $15,000 deposited November 10, 1959) of the proceeds of the sale of the real estate was deposited by the wife in her separate account. On October 16, 1962, $25,218.79, representing the balance on hand, was withdrawn and redeposited in another bank. In November 1963 the wife testified there was a balance of $24,000 in the new account after a withdrawal which had been made pursuant to the order of the court. The balance was so referred to in the court's opinions in November and the following June. The findings dated August 5, 1964 refer to ''the approximate amount of . . . $23,750.00 . . . now on deposit . . .''

The appeal is directed to the one-half of this last mentioned sum which was awarded the husband. Although the husband

has not appealed, the one-half of the deposit which was awarded to the wife is inextricably interwoven with the half which is the subject of these proceedings. Therefore that portion of the judgment which awarded the wife one-half of the deposit and the findings of fact and conclusions of law upon which it is predicated must also be set at large. (*Blache* v. *Blache* (1951) 37 Cal.2d 531, 538 [233 P.2d 547]; and see *Benam* v. *Benam, supra,* 178 Cal.App.2d 837, 845.) For the same reason, insofar as the revised findings, conclusions and judgment may appreciably change the aggregate properties received by each of the parties respectively, the trial court should be free to reapportion the remainder of the property which was adjudged to be community by the existing judgment, subject, of course, to the mandate of section 146 of the Civil Code.

The judgment is reversed as to the part thereof which awards to plaintiff and cross-defendant one-half of the funds on deposit in the savings account which stands in the name of defendant and cross-complainant, and which part is the subject of this appeal, and as well in respect of the provisions relating to the balance of said deposit and the apportionment of other property which was adjudged to be community property. The cause is remanded with directions to the trial court to set aside the findings of fact and conclusions of law upon which those portions of the judgment are predicated, to reexamine and redetermine the issues relating thereto in conformity with the views herein expressed, on the evidence now before it and on such additional evidence, if any, as it, in its discretion, may permit, and to make and file revised findings of fact and conclusions of law and render and enter judgment accordingly. Let each party bear his own costs of appeal.

Sullivan, P. J., and Molinari, J., concurred.